[Cite as *State v. Williams*, 2022-Ohio-2439.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                    Court of Appeals No.  L-21-1111

    Appellee/Cross-appellant           Trial Court No.  CR0201903101

v.

Ernest Williams                              **DECISION AND JUDGMENT**

    Appellant/Cross-appellee           Decided:  July 15, 2022

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney,
and Evy M. Jarrett, Assistant Prosecuting Attorney,
for appellee/cross-appellant.

Michael H. Stahl, for appellant/cross-appellee.

* * * * *

**ZMUDA, J.**

## I.  Introduction

{¶ 1} Appellant, Ernest Williams, appeals the judgment of the Lucas County Court of Common Pleas, sentencing him to seven years in prison after a jury found appellant guilty of felonious assault with a firearm specification.

## A.    Facts and Procedural Background

{¶ 2} On the afternoon of November 1, 2019, Alanna Walker let her dog outside without a leash.  The dog, a pit bull, ran to a nearby residence and jumped onto Beverly Crockett while she was outside, knocking her to the ground and injuring her.  A couple hours later, Crockett's daughter, Londa Coker, granddaughter, Tiarra Ali, and grandson, Keith Minor, approached the home in which Walker resided with her boyfriend, Jovan Johnson, and knocked on the door.  Appellant and his girlfriend, Ashley Talbert, were inside the residence at the time.

{¶ 3} Once everyone exited Walker's residence, a fight broke out between Johnson and Minor, and Ali and Talbert.  According to the state's witnesses, appellant then threatened Ali and went inside Walker's residence where he retrieved a firearm.  Upon returning outside, appellant fired several shots toward the crowd of people standing outside the residence.  One of the shots struck Ali in the back.  Thereafter, appellant and Talbert fled the scene.

{¶ 4} Eventually, Toledo Police Department detective Andre Cowell prepared a photo array, which was subsequently blindly administered upon Coker, Ali, and Minor by detectives Richard Fisher and Roy Kennedy.  The photo array was generated based upon Coker's description of the shooter, whom she described as a five-foot, three-inch tall African American man weighing between 160 and 180 pounds with dreadlocks.

2.

{¶ 5} Using Coker's description, Cowell created the photo array, which depicts six African American males between the ages of 24 and 40, each with skin tone, facial hair, hair and eye color, and approximate weight similar to appellant. In the array, appellant was depicted with dreadlocks that were tied back from his face. Another individual had braided hair that was similarly tied back from his face. The other individuals had closely trimmed hair.

{¶ 6} Ultimately, all three witnesses identified the same individual, appellant, as the shooter. As a result, appellant was indicted on December 5, 2019, and charged with one count of felonious assault in violation of R.C. 2903.11(A)(1) and (D), a felony of the second degree, and an attendant firearm specification under R.C. 2941.145(A), (B), (C), and (F).

{¶ 7} On February 7, 2020, appellant filed a motion to suppress evidence of his identification by Coker, Ali, and Minor following the administration of the photo array. In his motion, appellant argued that the photo array was unduly suggestive because he was the only individual pictured with dreadlocks.

{¶ 8} One week later, on February 14, 2020, the state filed its memorandum in opposition to appellant's motion to suppress, in which it emphasized the physical similarities of the men depicted in the photo array, including the similarity between appellant's dreadlocks and one of the men's braids.

3.

{¶ 9} On July 27 and August 13, 2020, the trial court held a hearing on appellant's motion to suppress. Six witnesses were called by the state to testify at the hearing. Appellant called no witnesses.

{¶ 10} For its first witness, the state called Coker. She explained that she was at work when she received a call on November 1, 2019, informing her that Crockett, with whom she resides, was attacked by a pit bull. Coker left work and went home to check on her mother. Minor and Ali were at the residence when Coker arrived.

{¶ 11} After checking on Crockett, Coker, Minor, and Ali confronted Walker about the dog attack. The altercations described above resulted, and according to Coker, she and another female broke up the fights. Coker testified that appellant then returned to the residence and came back outside with a firearm, which he fired twice. Coker stated that Ali was struck with the second shot. Thereafter, Coker saw the shooter got into a gray Buick sedan and departed.

{¶ 12} As to her identification of appellant as the shooter, Coker stated that she was able to clearly see him at the time of the shooting. She described appellant as a "black male, about 5'3", 5'4", I want to say 160, 180 pounds, between there, and he had dreads." Following the shooting, Coker met with detective Cowell and provided him with this description of the shooter.

{¶ 13} Using Coker's description, Cowell created the aforementioned photo array. Detective Fisher then showed the photo array to Coker approximately two hours after the

4.

shooting occurred. Coker identified appellant as the shooter. At the suppression hearing, Coker confirmed that Fisher did not suggest anyone to her as she was examining the photo array. Moreover, Coker identified appellant as the shooter during the state's direct examination.

{¶ 14} On cross examination, Coker acknowledged that only one person in the photo array had dreadlocks, and further confirmed that she knew the difference between dreadlocks and braids. Coker also testified that appellant's dreadlocks were a distinguishing characteristic, although she was not asked, and did not indicate, whether her identification of appellant was based solely on his hairstyle.

{¶ 15} As its second witness, the state called Ali. She testified that she received a call from Crockett on the afternoon of the dog attack. Because she lives nearby, she decided to visit Crockett. On her way, Ali called Coker and Minor to inform them of what happened. Once all three arrived at Crockett's residence, the group proceeded to Walker's residence to confront her about the dog attack. Ali testified that, while she was talking to Walker, she saw a vehicle pull up with several individuals, including appellant, inside. An argument ensued, ultimately culminating in the fight.

{¶ 16} According to Ali, she heard shots being fired as she was walking away from the scene and toward her vehicle. Ali stated that she heard "five, six" rounds, one of which struck her in the lower spine. Once she fell to the ground, she noticed that appellant was the one who shot her.

5.

{¶ 17} Ali was transported to the hospital following the shooting. While at the hospital, Ali spoke with detective Cowell and told him that she could identify the shooter, whom she described as a man with "brown, like dark skin with dreads" and a mustache. Ali was shown a photo array, at which point she identified appellant as the shooter. Notably, the others who were around Ali after the shooting were "crying like I don't know why Ernest did this." Therefore, Ali testified that, although she did not personally know appellant, she became familiar with his name prior to identifying him in the photo array.

{¶ 18} On cross examination, Ali was asked about appellant's dreadlocks in the photo array. Ali responded by referring to the individual with braided hair in the photo array, and said: "I don't know if five got dreads. I'm not sure how he got his hair, but Ernest don't even look like he has dreads in this picture." Ali went on to testify: "From the looks of it, I really can't tell if he had dreads or not, I just know his face."

{¶ 19} Following Ali's testimony, the state called Minor as its third witness. Minor testified that he and appellant were involved in a fight following the dog attack on November 1, 2019. After the fight ended, Minor saw appellant "run to his house and he came out the backyard somewhere and he was standing like in the back driveway, and he shot like * * * four shots." Minor confirmed that he observed appellant fire his weapon.

{¶ 20} After the shooting, Minor spoke with detective Cowell and described the shooter as a man with dreadlocks who was approximately 5'6" tall. Minor did not know

6.

appellant's name at the time he provided the description, although he indicated that he had seen appellant many times prior to the shooting.

{¶ 21} On December 24, 2019, Minor was shown the photo array prepared by Cowell. He identified appellant as the shooter. At the suppression hearing, the state asked Minor what characteristics allowed him to identify appellant, and Minor responded: "His dreads, and it was him. It looks just like him. It was him. * * * [J]ust his dreads and the way his face looked." On cross examination, Minor elaborated that he was "really familiar with [appellant's] face," and that he "knew who [appellant] was from his facial features because I'm over my grandmother's house all the time."

{¶ 22} For its fourth and fifth witnesses, the state called detectives Fisher and Kennedy, respectively. After explaining the training they received as blind administrators of photo arrays, the officers each testified that they administered the photo array in this case as blind administrators. Specifically, Fisher administered the photo array to Coker and Ali, and Kennedy administered the photo array to Minor. The officers testified that they had no prior knowledge of the case or any individuals, including appellant, who were involved in the case. Further, they both stated that they did not suggest which photo the witnesses should select.

{¶ 23} Finally, the state called detective Cowell to testify as its sixth witness. Cowell began his testimony by outlining the training he received in the area of preparing photo arrays. Relevant here, Cowell stated that his preparation of photo arrays generally

7.

involves using "parameters based on the individual's physical characteristics based on race, whether they have hair or they don't have hair, whether they have facial hair or not, whether they wear glasses or don't wear glasses."

{¶ 24} As to the photo array he prepared in this case, Cowell stated that the suspect was described as follows: "A black male. I don't remember the exact clothes description, but dreadlocks in his hair. And they had mentioned they had seen him there previously so they knew that that was the same person because they had seen him there on prior occasions." After receiving this description, Cowell identified appellant and entered him into the program that creates the photo array. Cowell then selected other individuals who share a similar appearance based upon sex, race, age, height, weight, hair, eye color, and facial hair. In Cowell's estimation, the individuals depicted in the photo array shared similar complexions, builds, and facial features. As to why appellant was the only individual with dreadlock in the photo array, Cowell explained that the program he used to create the photo array does not select for dreadlocks.

{¶ 25} At the conclusion of Cowell's testimony, the trial court took the matter under advisement. On September 10, 2020, the trial court held a pretrial hearing at which it recited the testimony provided during the suppression hearing, found that the photo array was not unduly suggestive, and thus denied appellant's motion to suppress.

{¶ 26} On April 26, 2021, the matter proceeded to a three-day jury trial. At the conclusion of the trial, appellant was found guilty of felonious assault with a firearm

8.

specification and, on May 6, 2021, was sentenced to a total of seven years in prison. On June 3, 2021, appellant filed a timely notice of appeal. On June 14, 2021, the state filed a notice of cross-appeal.

## B. Assignments of Error

{¶ 27} On appeal, appellant assigns the following errors for our review:

Assignment of Error I: The trial court erred when denying Mr. Williams' Motion to Suppress the results of the overly suggestive photo identification line-up, in violation of the U.S. and Ohio Constitutions.

Assignment of Error II: Mr. Williams was denied his statutory and constitutional rights to a speedy trial when his pre-trial incarceration exceeded one year and was very nearly two years.

{¶ 28} In its cross-appeal, the state asserts the following assignment of error:

Pursuant to the recently enacted Reagan Tokes Act, all defendants convicted of a non-life felony of the first or second degree that was committed on or after March 22, 2019 must receive an indefinite sentence.

## II. Analysis

## A. The Photo Array

{¶ 29} In his first assignment of error, appellant argues that the photo array administered in this case was unduly suggestive because appellant was the only individual with dreadlocks pictured in the array.

9.

{¶ 30} Our review of the trial court's denial of appellant's motion to suppress "presents a mixed question of law and fact." *State v. Wesson*, 137 Ohio St.3d 309, 2013-Ohio-4575, 999 N.E.2d 557, ¶ 40, quoting *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. We must accept the trial court's factual findings if they are supported by competent credible evidence, and "independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Wesson* at ¶ 40, quoting *Burnside* at ¶ 8.

{¶ 31} We have previously explained that "[p]hoto array evidence is suppressed only if the identification, or method of identification, is unduly suggestive and unreliable." *State v. Heflin*, 6th Dist. Lucas No. L-10-1268, 2011-Ohio-4134, ¶ 17, citing *State v. Waddy*, 63 Ohio St.3d 424, 438, 588 N.E.2d 819 (1992), citing *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). "In addition, if a pretrial photographic identification is followed by an eyewitness identification at trial, the photographic identification can be suppressed only if the procedure was suggestive enough to create 'a very substantial likelihood of irreparable misidentification.'" *State v. Gaines*, 6th Dist. No. WD-08-058, 2010-Ohio-91, ¶ 15, quoting *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968).

{¶ 32} The burden of establishing that the identification procedure was unduly suggestive rests with the defendant. *Heflin* at ¶ 17, citing *State v. Harris*, 2d Dist. Montgomery No. 19796, 2004-Ohio-3570, ¶ 19. "If the defendant meets his or her

10.

burden, the court must then consider whether the identification, viewed under the totality of the circumstances, is reliable despite its suggestive character." *Id.*, citing *Harris* at ¶ 19.

{¶ 33} In *Heflin*, we reviewed other Ohio appellate cases involving challenges to photo arrays, and concluded: "Where the other men depicted in the photo array with the defendant all appeared relatively similar in age, features, skin tone, facial hair, dress, and photo background, the photo array was not impermissibly suggestive." *Id.* at ¶ 18, citing *State v. Jacobs*, 7th Dist. Mahoning No. 99-CA-110, 2002-Ohio-5240, ¶ 18, and *State v. Lampkin*, 6th Dist. Lucas No. L-09-1270, 2010-Ohio-4934, *rev'd on other grounds, State v. Lampkin*, 130 Ohio St.3d 270, 2011-Ohio-5715, 957 N.E.2d 770. Because the photo array shown to the witnesses in that case depicted individuals with skin tones and facial features that were similar to the defendant's, we found that the photo array was not unduly suggestive. *Id.* at ¶ 21.

{¶ 34} Similarly, in *State v. Williams*, 6th Dist. Erie No. E-18-024, 2019-Ohio-5144, we found that a photo array was not unduly suggestive where the officer who administered the array created it using computer software that generated pictures of five other men who were of a similar age and similar physical characteristics (hair, eye color, and race) to the defendant. *Id*. at ¶ 12. We noted that the defendant was not placed into the first slot in the photo array and the administering officer did not know the suspect's identity or if a suspect was even present in the photo lineup. *Id.*

11.

{¶ 35} Consistent with our prior holdings in *Heflin* and *Williams*, we find that the photo array administered in this case was not unduly suggestive. Based upon our review of the photo array and examination of the testimony provided at the suppression hearing, we find that the individuals depicted in the photo array have a similar appearance, albeit with slightly different hair. While only appellant has dreadlocks, his hair is pulled back from his face, making it difficult to discern the dreadlocks. Further, another individual depicted in the photo array has braided hair that Ali recognized as consistent with either braided hair or dreadlocks. Despite her difficulty in discerning whether appellant's photograph clearly showed his dreadlocks, Ali was able to identify appellant because she recognized his face. The same is true for Coker and Minor.

{¶ 36} Notwithstanding slight differences in hairstyle, the remaining identifying characteristics of the individuals selected for the photo array are similar to appellant's physical features. Indeed, all of the individuals are African American men that appear to be similar in age, skin tone, and eye color. Moreover, all of the men have similar facial hair and the background of all the photos is nondescript. Therefore, we find that appellant has not met his burden of demonstrating that the identification procedure used in this case was unduly suggestive. For this reason, we find that the trial court properly denied appellant's motion to suppress.

{¶ 37} Accordingly, appellant's first assignment of error is not well-taken.

12.

## B. Speedy Trial Considerations

{¶ 38} In his second assignment of error, appellant argues that the trial court erred in failing to dismiss the charges against him based upon speedy trial violations.

{¶ 39} The right to a speedy trial is guaranteed by the United States and Ohio Constitutions. *State v. Adams*, 43 Ohio St.3d 67, 68, 538 N.E.2d 1025 (1989). "In reviewing a denial of a motion to dismiss based on an appellant's right to a speedy trial, we apply a de novo standard of review." *State v. Smith*, 6th Dist. Lucas No. L-14-1224, 2016-Ohio-150, ¶ 7, citing *State v. Browand*, 9th Dist. Lorain No. 06CA009053, 2007-Ohio-4342, ¶ 10.

{¶ 40} Ohio's speedy trial statute, R.C. 2945.71, provides that a defendant who is charged with a felony must be brought to trial within 270 days of his arrest. "For calculation purposes, speedy-trial time begins running the day after the defendant's arrest." *State v. Parker*, 6th Dist. Lucas No. L-18-1238, 2020-Ohio-4607, ¶ 61, citing *State v. Taylor*, 6th Dist. Lucas No. L-98-1375, 2001 WL 1198648, *4 (Oct. 5, 2001). Under the "triple count provision" set forth in R.C. 2945.71(E), each day an accused is held in custody in lieu of bail on the pending charge counts as three days for purposes of computing the speedy trial timeframe. While appellant was indeed held in custody while he awaited trial in this case, he was also held in custody on an unrelated case and was thus not held in custody *solely* on the charges in this case. The triple-count provision applies "only to those defendants held in jail in lieu of bail solely on the pending charge."

13.

*State v. MacDonald*, 48 Ohio St.2d 66, 357 N.E.2d 40 (1976), paragraph one of the syllabus. "Thus, when a defendant awaits trial on separate unrelated cases, the triple-count provision does not apply." *State v. Sydnor*, 4th Dist. Scioto No. 10CA3359, 2011-Ohio-3922, ¶ 19, citing *State v. Ladd*, 56 Ohio St.2d 197, 203, 383 N.E.2d 579 (1978). Therefore, the triple-count provision does not apply, and the 270-day period set forth in R.C. 2945.71(C)(2) governs.

{¶ 41} Here, appellant was arrested on November 26, 2019. The jury trial in this case began on April 26, 2021, 516 days after appellant's arrest. Therefore, more than 270 days elapsed from the time appellant was arrested until the start of trial. However, several tolling events occurred during this time period.

{¶ 42} The first tolling event took place on January 14, 2020, when appellant appeared before the trial court for a pretrial and requested a continuance. Under R.C. 2945.72(H), the speedy trial clock is tolled during "the period of any continuance granted on the accused's own motion." Consequently, the speedy trial clock stopped running from January 14, 2020, until the matter was recalled on February 4, 2020, a total of 21 days.

{¶ 43} Next, appellant filed his motion to suppress on February 7, 2020. Appellant's motion to suppress was decided on September 10, 2020, a total of 215 days. "The time period within which a defendant must be brought to trial is tolled from the day of the filing of a motion to suppress until the day the trial court rules on the motion,

14.

pursuant to R.C. 2945.72(E), provided that the trial court rules within a reasonable period of time." *State v. Beaver*, 6th Dist. Ottawa No. 93OT001, 1993 WL 551550, *3 (Dec. 17, 1993), citing *State v. Arrizola*, 79 Ohio App.3d 72, 606 N.E.2d 1020 (3d Dist.1992).  To determine whether a tolling period incurred by a defendant's motion is "reasonable," we must consider "the particular circumstances of the case, the complexity of the facts and difficulty of the legal issue involved, and the time constraints on the trial court." *Parker* at ¶ 63, citing *State v. Crawford*, 6th Dist. Lucas No. L-17-1297, 2019-Ohio-2660.

{¶ 44} In early March 2020, the trial court suspended its operations in light of the Covid-19 public health emergency.  During that time, the trial court issued an entry granting appellant's request to reschedule his trial from May 4, 2020, to June 1, 2020.  On June 1, 2020, the court called the matter for a suppression hearing and trial via Zoom, but appellant requested that the suppression hearing be rescheduled for June 24, 2020, and asked to have the trial rescheduled for July 27, 2020.  The trial court granted appellant's request.  On June 24, 2020, the trial court called the matter for a suppression hearing, but appellant again asked that the matter be rescheduled, this time until July 27, 2020.  The trial court granted appellant's request.  Finally, the suppression hearing began on July 27, 2020.  Due to the unavailability of detective Cowell, the matter had to be continued until August 13, 2020.  Less than one month later, on September 10, 2020, the trial court issued its decision denying appellant's motion to suppress.

15.

**{¶ 45}** During the 215 days that elapsed between appellant's filing of his motion to suppress and the trial court's denial of the motion, the matter was continued a number of times at appellant's request, and the trial court was tasked with managing its docket amid a public health emergency. Under these circumstances, we find that the 215-day tolling period incurred by appellant's motion to suppress was reasonable. Indeed, we have previously found that delays associated with the coronavirus pandemic toll the speedy trial clock. *See State v. Wright*, 6th Dist. Lucas No. L-21-1101, 2022-Ohio-143, ¶ 37 ("Pursuant to R.C. 2945.72(H), [*State v. McCorkle*], 2d Dist. Greene No. 2020-CA-36, 2021-Ohio-2604, and 2020 Ohio Atty.Gen.Ops. No. 2020-002, we find the pandemic emergency is a reasonable basis for a continuance. Therefore, the clock is stopped.").

**{¶ 46}** On October 6, 2020, appellant appeared before the trial court for a pretrial. Appellant's defense counsel informed the trial court that appellant wished to retain private counsel, and appellant addressed the court, stating that his family was trying to retain a different attorney on his behalf due to his dissatisfaction with his appointed counsel. Appellant then requested a continuance to give him the time necessary to secure counsel. The trial court granted the request and continued the matter until October 27, 2020, a total of 21 days.

**{¶ 47}** In sum, the foregoing tolling events total 257 days. Reducing the 516-day time period during which appellant was awaiting trial by this tolling period, appellant was brought to trial no longer than 259 days after his arrest. Since he was brought to trial

16.

within 270 days as required under R.C. 2945.71, appellant was not entitled to a dismissal of the charges brought against him based upon speedy trial concerns.

{¶ 48} Accordingly, appellant's second assignment of error is not well-taken.

### C.    Imposition of a Definite Sentence

{¶ 49} In the state's sole assignment of error, it argues that the trial court erred by imposing a definite sentence for an offense that is subject to the indefinite sentencing requirements of the Reagan Tokes Act.

{¶ 50} Under R.C. 2953.08(B)(2), the state has the right to appeal a sentence if it is contrary to law. *State v. Clausing*, 8th Dist. Cuyahoga No. 110776, 2022-Ohio-1762, ¶ 19. "A sentence that fails to impose a mandatory provision is contrary to law." *Id.*, citing *State v. Underwood*, 124 Ohio St.3d 365, 2010-Ohio-1, 922 N.E.2d 923, ¶ 21.

{¶ 51} The portion of the Reagan Tokes Act relevant to this assignment is codified in R.C. 2929.14(A)(2)(a), which provides:

> For a felony of the second degree committed on or after [March 22, 2019], the prison term shall be an indefinite prison term with a stated minimum term selected by the court of two, three, four, five, six, seven, or eight years and a maximum term that is determined pursuant to section 2929.144 of the Revised Code * * *.

{¶ 52} Here, appellant committed his offense on November 1, 2019, after the effective date of the Reagan Tokes Act and thus subject to the indefinite sentencing

17.

provisions outlined above.  As such, the trial court's imposition of a definite sentence contravenes R.C. 2929.14(A)(2)(a) and is contrary to law.  *See Clausing* at ¶ 22 ("Although Clausing's rape convictions on Counts 1 and 8 were both qualifying offenses subject to indefinite sentences, the trial court imposed definite six-year prison terms on both counts.  Accordingly, we find that the definite sentences imposed by the trial court were contrary to law.").  Appellant notes the existence of an ongoing debate as to the constitutionality of the Reagan Tokes Act, but does not dispute that the trial court's imposition of a definite sentence was erroneous.

{¶ 53} Accordingly, we find the state's assignment of error well-taken.

### III. Conclusion

{¶ 54} In light of the foregoing, the judgment of the Lucas County Court of Common Pleas is affirmed, in part, and reversed, in part.  The trial court's aggregate seven-year sentence is vacated, and the matter is remanded to the trial court for resentencing in accordance with the indefinite provisions of the Reagan Tokes Act.  Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed, in part,
and reversed, in part.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27.  *See also* 6th Dist.Loc.App.R. 4.

State of Ohio
v. Ernest Williams
L-21-1111

Thomas J. Osowik, J. _____

_____
JUDGE

Gene A. Zmuda, J. _____

_____
JUDGE

Christine E. Mayle, J. _____
CONCURS AND WRITES
SEPARATELY.

_____
JUDGE

**MAYLE, J.**

{¶ 55} I concur in the majority decision, and I agree with its conclusion with respect to Williams's first assignment of error that the trial court did not err in denying Williams's motion to suppress the pre-trial identification evidence on the basis that the photo array was impermissibly suggestive. I write separately only to emphasize that a photo array *may* be impermissibly suggestive where the witness describes the suspect by reference to a unique characteristic—such as dreadlocks—and the defendant's photo is the only photo in the array bearing that characteristic. *See Hodges v. Commonwealth*, 613 S.E.2d 834, 853-854 (Va.App.2005), *rev'd on other grounds Hodges v.*

19.

*Commonwealth*, 272 Va. 418, 634 S.E.2d 680 (2006) ("Had the investigators told Al–Rammal they were looking for a young black male with dreadlocks and then showed him a photo array in which only one black male with dreadlocks appeared, no doubt exists that the lineup would have been unduly suggestive."); *Frazier v. New York*, 187 F. Supp. 2d 102, 111 (S.D.N.Y. 2002) (finding lineup unduly suggestive where only consistent witness description involved dreadlocks and defendant was only individual with dreadlocks); *State v. Salmon*, 783 A.2d 1193, 1198 (Conn.App.2001) ("[H]ad the array contained the defendant's photograph with dreadlocks while the other photographs contained none, there might be an argument that the defendant would stand out from the others."). *But see State v. Gaines*, 11th Dist. No. 2015-T-0061, 2016-Ohio-1312, 62 N.E.3d 708, ¶ 19-23 ("While only appellant had what some would consider 'true' dreadlocks, that fact alone did not make the array unduly suggestive."); *People v. Perkins*, 68 N.E.3d 679, 682-83 (N.Y.2016) ("We by no means propose that a lineup is unduly suggestive, as a matter of law, merely because a defendant has a different hairstyle than some or all of the fillers."); *Davis v. State*, 528 S.E.2d 800, 807 (Ga.2000) ("The pre-trial photo array shown [to eyewitness] was not impermissibly suggestive simply because Hill was the only person depicted with dreadlocks.").

{¶ 56} Here, in addition to a variety of other features, the witnesses all described that the suspect had dreadlocks. But it is not entirely clear from Williams's photo whether he even had dreadlocks. It looks as though (1) his hair is cropped and a shadow

20.

is cast behind him, or (2) his hair is long (and may or may not be in dreadlocks) and is pulled back behind his shoulders. The victim acknowledged as much when she testified at the suppression hearing. T.A. was shown a copy of the photo array and was asked how many people in the photo array were pictured with dreadlocks. She responded: "Ernest don't even look like he has dreads in this picture." I agree with the majority, therefore, that this photo array was not unduly suggestive because, first, Williams's hairstyle was not the only characteristic described by the witnesses, and second, it is not even clear from the photo in the array that Williams had dreadlocks.

{¶ 57} Additionally, even where a photo array is deemed suggestive, "[p]hoto array evidence is suppressed only if the identification, or method of identification, is unduly suggestive *and* unreliable." (Emphasis added.) *State v. Heflin*, 6th Dist. Lucas No. L-10-1268, 2011-Ohio-4134, ¶ 17. Reliability is determined under the totality of the circumstances. *Id.* Factors to be considered include: "(1) the victim's opportunity to view the defendant during the crime, (2) the victim's degree of attention, (3) the accuracy of the victim's prior description, if any, of the defendant, (4) the victim's certainty, and (5) the amount of time that has elapsed between the offense and the identification." *Id.*

{¶ 58} Here, as the majority summarizes, the victim and other eyewitnesses did not know Williams's name before the shooting, but they were certain of their identification of him because they had seen him before and recognized him. L.C. testified that she had seen Williams before "going in and out of next door." T.A.

21.

testified, "From the looks of [Williams's photo in the array], I really can't tell if he had dreads or not, I just know his face." And K.M. testified that he saw Williams at his grandmother's neighbor's house "all the time." He said "I've seen him all the time before the incident" and "knew who [Williams] was from his facial features * * *." Accordingly, under the totality of the circumstances here, the witnesses' identifications were not unreliable and the trial court did not err in refusing to suppress them.

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.

22.