[Cite as *State v. Roberts*, 2023-Ohio-142.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICTW
LUCAS COUNTY

State of Ohio                                          Court of Appeals No.  L-20-1171

      Appellee                                      Trial Court No.  CR0201902202

v.

Dominique Roberts                              **DECISION AND JUDGMENT**

      Appellant                                    Decided: January 18, 2023

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Evy M. Jarrett, Assistant Prosecuting Attorney, for appellee.

Michael H. Stahl, for appellant.

* * * * *

**OSOWIK, J.**

{¶ 1} This is an appeal from a judgment of the Lucas County Court of Common

Pleas, which sentenced defendant-appellant, Dominique Antonio Roberts, after a jury

convicted him of three of four felony offenses with firearm specifications. For the reasons

set forth below, this court affirms, in part, and reverses, in part, the judgment of the trial court.

{¶ 2} Appellant sets forth 14 assignments of error in this appeal:

1.    The trial court erred when it denied Mr. Roberts' motion to suppress the overly suggestive and improperly administered identification of Mr. Roberts in violation of the statute and due process under the Ohio and United States constitutions.

2.    The trial court erred when it, over objection, permitted State to recall Dewey Edwards (who was uncharged owner of the murder weapon and the vehicle alleged to be used in the acts) after his testimony concluded so that Mr. Edwards could change his testimony and identify Mr. Roberts after a conversation in the hall with the prosecutor.

3.    The trial court erred in admitting evidence over objection and in instructing the jury, over objection, that it could infer guilt from Mr. Roberts allegedly refusing to open his mouth for a DNA swab.

4.    The trial court erred and violated due process under the Ohio and United States Constitutions, when [it] prevented Mr. Roberts from fully impeaching the testimony of an alleged co-conspirator based upon inapplicable Evid.R. 404(B).

5.    The trial court erred when it permitted the State, over objection, to admit an alleged co-conspirator's alleged prior consistent statements as nonhearsay under Evid.R. 801(D)(1)(b) when the prior statement was NOT made before the motive to fabricate came about. (Emphasis sic.)

6. The trial court erred in admitting, over objection, hearsay statements of an alleged co-conspirator without a prima facie case of the underlying conspiracy being demonstrated by independent evidence.

7. The trial court erred in not instructing the jury on lesser included offenses.

8. The cumulative effect of the trial court's errors deprived Mr. Roberts of a fair trial.

9. The State produced insufficient evidence to sustain a conviction on any charge, the Constitutions of the United States and Ohio require that Mr. Roberts be discharged.

10. The jury's verdict was contrary to the manifest weight of the evidence.

11. Mr. Roberts' right to a speedy trial under Ohio statute law and the Constitutions of Ohio and the United States was violated when he was held in custody for over a year prior to trial.

12. Mr. Roberts was denied the equal protection of law guaranteed by the Ohio Constitution and the Fourteenth Amendment to the U.S. Constitution due to the selection process and the prosecution's use of peremptory and for-cause challenges to jurors and the selection process violated his rights to due process and an impartial jury.

13. The trial court committed plain error when it incorrectly imposed an indeterminate sentence as purportedly required by the "Reagan Tokes" law as the statutory scheme violates the separation of powers established in the Ohio Constitution.

14. The trial court erred when it imposed consecutive sentences when all three counts should have merged for purposes of sentencing.

3

## I. Background

{¶ 3} This appeal originated from four felony indictments issued on July 11, 2019, by a Lucas County Grand Jury against defendant-appellant and co-defendants Adrian Eaton, Darion Martin, and Justin Wright: one count of aggravated murder, a violation of R.C. 2903.01(B) and (F) and an unspecified felony under R.C. 2929.02; one count of murder, a violation of R.C. 2903.02(B) and an unspecified felony under R.C. 2929.02; one count of aggravated robbery, a violation of R.C. 2911.01(A)(1) and a first-degree felony under R.C. 2911.01(C); and one count of aggravated burglary, a violation of R.C. 2911.11(A)(2) and a first-degree felony under R.C. 2911.11(B). Each of the foregoing counts included a firearm specification under R.C. 2941.145(A), (B), (C) and (F).

{¶ 4} The jury trial commenced on August 3, 2020. The jury heard testimony from 25 witnesses, and the trial court admitted 229 exhibits into evidence. The following is a summary of events. On July 6, 2019, at around 3:00 a.m., the armed appellant, with two armed co-defendants, Mr. Wright and Mr. Eaton, and while co-defendant Mr. Martin waited with the getaway car, planned and executed a robbery on their second visit to Apartment B of 1324 Ironwood Avenue, East Toledo, Lucas County, Ohio. On the first visit earlier that evening, Mr. Wright and Mr. Eaton purchased marijuana from a victim, Tyler Carr, and hung out at the apartment with a few people playing video games, drinking, and smoking while appellant and Mr. Martin remained with the car. Eventually all four co-defendants drove off to find more drugs and to stop at a gas station, though not to purchase

4

gas for the car, during which the plan to rob with guns drawn was formed, and they all returned to the apartment. Mr. Martin again remained with the getaway car.

{¶ 5} Within minutes of, but separately from, Mr. Wright and Mr. Eaton, with guns drawn, entering the apartment from the front, appellant entered the apartment from the rear, loudly announced the robbery while pacing with his gun to complete the theft of money, wallets, guns and drugs from those victims present, including David Zeller, Shayne Jackson, and Mr. Carr. The gun used by Mr. Wright discharged five bullets at the crime scene, which were matched with bullets recovered from peoples' bodies and with the recovered shell casings: three hit Mr. Carr, killing him; one hit another visitor, Joshua Taylor, who survived but did not testify at trial; and the fifth bullet hit appellant in the groin, who also survived. The gun used by appellant discharged at least two bullets at the crime scene.

{¶ 6} The three co-defendants burst from the apartment and entered the getaway car driven by Mr. Martin. Mr. Wright had accidentally shot appellant in the groin and helped him to the car, where appellant bled while in the backseat. Soon after, the getaway car ran out of gas and stalled on the Craig Street Bridge. The co-defendants decided to abandon the car and walk away, but appellant was too injured to walk. To receive medical attention, he developed a story to tell 9-1-1 that while he was walking at that hour, he was the victim of a drive-by shooting. Police arrived and then an ambulance transported appellant to a nearby hospital, St. Vincent's. The police investigation was already underway at 1324

5

Ironwood Avenue, and now it expanded to the abandoned car and the area where they found appellant. Appellant was arrested on July 6, 2019.

**{¶ 7}** Following an eight-day trial and deliberations, on August 13, 2020, the jury found appellant not guilty of aggravated murder, and guilty of murder with firearm specification, guilty of aggravated robbery with firearm specification, and guilty of aggravated burglary with firearm specification. Sentencing occurred on September 4, 2020. Appellant timely appealed.

**{¶ 8}** We will address appellant's assignments of error out of order.

## II. Speedy Trial

**{¶ 9}** Appellant's eleventh assignment of error argues his prima facie case for the violation of his constitutional right to a speedy trial is evident because, citing *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 88, "it would appear from the face of the charges that the 3 for 1 provision in the speedy trial statute would apply here and that the 90 [days] would have expired but for the improper allocation of the continuances of the Sept. 13, 2019 trial date in August of 2019, as well as the attribution of the February 12, 2020 to April continuance to Mr. Roberts." We disagree.

**{¶ 10}** Appellant does not provide us with a clear calculation with which to evaluate his speedy trial claim, and merely points to the two continuances, which we review for an abuse of discretion. *State v. Drain*, Slip Opinion No. 2022-Ohio-3697, ¶ 54. Trial judges have the authority to grant or deny continuances, which is entrusted in the judge's broad, sound discretion, on a case-by-case basis. *Id.*, citing *In re Disqualification of Fleegle*, 161

6

Ohio St.3d 1263, 2020-Ohio-5636, 163 N.E.3d 609, ¶ 7, and *State v. Unger*, 67 Ohio St.2d 65, 423 N.E.2d 1078 (1981), syllabus. Abuse of discretion "'connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable.'" *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983), quoting *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980).

{¶ 11} Both the Ohio and United States Constitutions guarantee the right to a speedy trial. *State v. Wright*, 6th Dist. Lucas No. L-20-1206, 2022-Ohio-1537, ¶ 82. "The General Assembly has enacted R.C. 2945.71 through 2945.73 in a legislative attempt to quantify a defendant's right to a speedy trial as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution." *State v. Montgomery*, 61 Ohio St.2d 78, 79-80, 399 N.E.2d 552 (1980). Where appellant was charged with felonies, he must be brought to trial within 270 days after his July 6, 2019 arrest. R.C. 2947.71(C)(2). The speedy trial calculation begins the day after arrest. *State v. Williams*, 6th Dist. Lucas No. L-21-1111, 2022-Ohio-2439, ¶ 40. However, for the duration appellant was held in custody in lieu of bail, each day counted as three days pursuant to R.C. 2945.71(E), so long as he was held in custody solely on the pending felony charges. *Id.* That was the case with appellant, and his speedy trial calculation adjusted from 270 to 90 days, subject to applicable tolling events. *See id.* at ¶ 41. Pursuant to R.C. 2945.72, there are nine instances in which appellant's trial date may be extended, and we find R.C. 2945.72(E), (G), and (H) are relevant to appellant's claim.

**A. September 23, 2019 Trial Date**

7

{¶ 12} The September 23, 2019 trial date is the first alleged speedy-trial violation. The record shows that appellant first challenged his speedy trial calculation on February 19, 2020, when he made oral motions for nunc pro tunc entries to trial court orders journalized on August 26, 2019, and on February 13, 2020, for hearings held on August 21, 2019, and February 12, 2020, respectively, arguing each trial date continuance should not be attributed to appellant for speedy trial purposes.

{¶ 13} Appellant argued that on August 21, 2019, he did not request a continuance, but merely confirmed the September 23, 2019 trial date previously set on July 31, 2019. However, at the hearing appellant also made an oral motion "to sever [the four] defendants and * * * that the [September] 23rd [trial] date be assigned solely to my client, Dominique Roberts." Appellee opposed the motion, arguing that the issue of severing the co-defendants' cases requires an assessment of *Bruton v. United States*, 391 U.S. 123, 20 L.Ed.2d 476, 88 S.Ct. 1620 (1968). After additional discussion with the parties regarding the ongoing discovery and appellant's insistence of confirming September 23 for trial, the trial court concluded, "We'll keep it as to 9/23 then with a great likelihood, rather, that it will be converted to a pretrial."

{¶ 14} Appellant's motion to sever the trials of the co-defendants raises R.C. 2945.72(E). We find no abuse of discretion by the trial court's attribution of confirming the September 23, 2019 trial date to defendant in its August 26 journalized entry stating, "Matter called for trial. Pursuant to the request of defendant trial date of September 23,

8

2019 is confirmed." Ultimately, the trial court acknowledges the attribution to appellant did not toll appellants' speedy-trial calculation, and we will not disturb that finding.[1]

**B. April 6, 2020 Trial Date**

{¶ 15} The April 6, 2020 trial date is the second alleged speedy-trial violation. Appellant argued that at the February 12, 2020 hearing, he did not request a further continuance, but agreed to the April 6, 2020 trial date set that day as the first available date after announcing appellant was not available for trial on March 30. The hearing transcript shows the following exchange with the trial court:

COURT: * * * Give you March 30th.

DEFENSE COUNSEL: I am unable on the 30th. I have State versus Brown, three defendants with Judge Mandros which is only about the fourth trial date.

COURT: April 6 would be the next Monday available on the court's calendar.

DEFENSE COUNSEL: I just have to move one thing with Judge Winters and I'll start doing that immediately.

PROSECUTION: The State can make itself available.

---

[1] In its August 7, 2020 journalized entry, the trial court stated, "On February 19, 2020, Defendant * * * suggested that his speedy trial rights were infringed. Counsel briefed the matter. This briefing correctly points out that the August 21, 2019 pretrial, at which the September 23, 2019 trial date was simply confirmed, does not act as a tolling event."

9

DEFENSE COUNSEL: I ask if we could start about 9:15. I have a federal matter.

COURT: We have a couple matters that we're continuing so, practically, that would not be a problem. Trial date set with counsel April 6th, 2020 at 9:15 a.m. Thank you. We'll continue bond and see you then.

**{¶ 16}** Appellant's unavailability for trial until April 6, 2020, raises R.C. 2945.72(H). We find no abuse of discretion by the trial court's attribution of the April 6 trial date to defendant in its February 13 journalized entry stating, "Matter called for pre-trial. Pursuant to the request of defendant matter rescheduled for trial on April 6, 2020[,] at 9:00 a.m. Bond is continued."[2]

### C. August 3, 2020 Trial Date

**{¶ 17}** Appellant's trial did not commence on April 6, 2020, because the unprecedented Covid-19 pandemic occurred. The record shows that, retroactive to March 9, 2020, the Ohio legislature passed Am. Sub. H.B. 197, specifically tolling the statutory speedy-trial time calculations until July 30, 2020. *Drain*, Slip Opinion No. 2022-Ohio-3697, at ¶ 48; *Wright*, 6th Dist. Lucas No. L-20-1206, 2022-Ohio-1537, at ¶ 93, citing 2020

---

[2] The April 6 trial date was subsequently vacated by trial court order journalized on March 9 reflecting that at a March 6 hearing the parties set March 16 for trial. However, on March 10, appellant filed a motion to vacate the March 16 trial date with the understanding "that any and all time from the filing of this motion until the new trial date will be tolled from any speedy trial calculation and that time will be charged to the defendant. The continuance is necessary to achieve the interests of justice." The trial court granted the motion by journalized judgment entry on March 17 and, once again, set the trial date for April 6. Appellant does not appeal the trial court's March 17 order.

Am.Sub.H.B. No. 197, Sections 22(A)(3), (B), and (C) ("the expiration date for tolling under the emergency act was July 30, 2020"). Appellant mistakenly argues the state of emergency ended on May 29. "Because the period of emergency was still in effect as of July 30, 2020, July 30 is the date on which the tolling period ended." *Chapman Enterprises, Inc. v. McClain*, 165 Ohio St.3d 428, 2021-Ohio-2386, 179 N.E.3d 1201, ¶ 11.

{¶ 18} On April 2, the trial court sua sponte and optimistically, given the benefit of hindsight regarding the pandemic, reset the April 6 trial date for June 1. R.C. 2945.72(G) and (H). Then on May 19, the trial court held "an off-the-record attorney only pre-trial" discussing the logistics of conducting a jury trial during the Covid-19 pandemic after the tolling period expires, followed by a May 22 on-record status pretrial hearing via Zoom during which the parties affirmed that on May 19 they agreed to vacate the June 1 date and reset it for August 3 as the first available trial date after the emergency order was anticipated to expire on July 30. Continuing a trial beyond the end of July 30 tolling period because of the pandemic state of emergency is reasonable under R.C. 2945.72(H) without violating speedy-trial requirements. *Wright* at ¶ 94-95, citing *Fleegle*, 161 Ohio St.3d 1263, 2020-Ohio-5636, 163 N.E.3d 609, at ¶ 7.

{¶ 19} Then the record shows that at 2:12 p.m. on Friday, July 31, 2020, pursuant to R.C. 2945.73(B), appellant filed a motion, on speedy-trial grounds, to dismiss all charges against him at his trial scheduled to begin on Monday morning, August 3. The trial court denied appellant's motion to dismiss, and its decision was journalized on August 7. We

11

review de novo the trial court's denial of a motion to dismiss based on appellant's right to a speedy trial. *Wright* at ¶ 82.

{¶ 20} Upon de novo review we agree with the trial court's speedy trial calculations from its journalized entry as follows:

Defendant filed a motion to suppress on September 10, 2019. On the date of trial, September 23, 2019, Defendant requested that the trial date be vacated and that his motion be heard first. The motion was set for hearing October 18, 2019. On that date, Defendant again requested a continuance of his motion hearing. The motion hearing was reset to November 1, 2019.

However, in the interim, the court had a conflict due to a jury trial in an older case. So on November 1, 2019, while the court was occupied with trial matters, Judge Jennings assisted by continuing the motion hearing at the court's request to November 19, 2019. Before that date arrived, Defendant filed a motion for relief from prejudicial joinder on November 13, 2019. The court set a hearing date on December 9, 2019. On that day, Defendant requested a continuance to December 20, 2019[,] of the motion hearing. The hearing went forward on that date.

At the conclusion of the hearing, counsel was provided time to file post-hearing briefs. (Also at the conclusion of the hearing, Defendant's motion for relief from joinder was granted.) Briefs were submitted, and the court made its decision denying the motion to suppress on February 4, 2020.

12

The order memorializing same was journalized the next day. The order also set the matter for scheduling pretrial [on] February 12, 2020. It was on this date the April 6, 2020 trial date was set. Moreover, the court finds persuasive the holding of *State v. Phillips*, 2009-Ohio-7069, cited by the state in the instant case: "* * * where a trial court must reschedule a trial because of a motion of the accused, whether styled as a motion for a continuance or not, the entire time between the motion and the rescheduled trial date is a delay attributable to a motion filed by the accused under R.C. 2945.72(E)." *Id.* at para. 25. Thus, speedy trial time was tolled from September 10, 2019 to April 6, 2020, and only 39 days of the speedy trial clock had been consumed.

But assume, only for argument's sake, that the clock started running February 4, 2020, when the decision on the motion to [suppress] was file-stamped. That would mean another 34 days of speedy trial time was consumed between February 4, 2020 and March 9, 2020, when the pandemic-related tolling, described below, began. (In any event, Defendant requested that the March 16, 2020 trial date be vacated by his March 10, 2020 motion, which stated as follows: "Defendant understands that any and all time from the filing of this motion until the new trial date will be tolled from any speedy trial calculation and that time will be charged to the defendant.") As of the pandemic-related tolling event, 73 days would have expired. As of Defendant's March 10, 2020 motion 74 days would have expired. Four

13

additional days elapsed between the end of the pandemic-related tolling to the August 3, 2020 trial date. Thus, even under Defendant's argument (an ignoring Defendant's own March 10, 2020 motion), only 77 days out of 90 have elapsed. No matter how you slice it, this case is being tried within time.

**{¶ 21}** Appellant's eleventh assignment of error is not well-taken.

### III. Jury Selection

**{¶ 22}** Appellant's twelfth assignment of error argues his constitutional rights to due process and equal protection were violated by appellee's use of peremptory and for-causes challenges to prospective jurors. We disagree.

### A. Due Process

**{¶ 23}** Appellant, who self-identifies as an African-American, argues his due process rights were violated when he was tried by a predominantly white jury for three reasons: (1) the jury was "called into court in batches rather than in a single group, which resulted in an initial venire batch which was of such a nature that one of the potential jurors stated, 'I would like to see a more diverse jury'"; (2) the "early morning batch of jurors contained an inordinate number of potential jurors who were either retired or disabled"; and (3) "jurors were liberally excused for any issues related to the pandemic, and it appears from the court's commentary that there was at least some self-selection by jurors simply not showing up * * * and does not represent a cross section of the community and that the current rule does not adequately address the situation." Appellant concluded, "The concern

14

here is real, and, although it is hoped to never be repeated, an analysis of the pandemic related selection process is important."

{¶ 24} Generally, appellate review of a trial court's determination of the conduct and scope of voir dire is for an abuse of discretion. *State v. Worley*, 164 Ohio St.3d 589, 2021-Ohio-2207, 174 N.E.3d 754, ¶ 90; *State v. Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d 616, ¶ 144. "Moreover, we will not find prejudicial error in a trial court's qualification of venirepersons as fair and impartial jurors unless the defendant can show a clear abuse of discretion." *Id.*

> In order to establish a violation of the fair representative cross-section of the community requirement for a petit jury array under the Sixth and Fourteenth Amendments to the United States Constitution, a defendant must prove: (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that the representation is due to systematic exclusion of the group in the jury-selection process.

*State v. Fulton*, 57 Ohio St.3d 120, 566 N.E.2d 1195 (1991), paragraph two of the syllabus, *applying and following Duren v. Missouri*, 439 U.S. 357, 364, 58 L.Ed.2d 579, 99 S.Ct. 664 (1979).

{¶ 25} Appellant argues the morning and afternoon batches of jurors generally reflected a lack of diversity for race, age, employment, physical abilities, and sensitivity

15

towards the pandemic. We cannot say, based on the lack of evidence provided by appellant, that nonmorning people who are "inordinately" retired and disabled, and that pandemic-sensitive people, are each distinctive groups for purposes of fair cross-section juror analysis.

{¶ 26} Specifically, appellant's request for "an analysis of the pandemic related selection process" is not persuasive. "[I]n its instructions for holding trials during the COVID-19 pandemic, the Supreme Court left to '"the sound discretion of the local judiciary how to best manage the daily challenges that the Covid-19 pandemic ha[d] foisted on local courts."'" (Citations omitted.) *State v. Blenman*, 11th Dist. Ashtabula No. 2020-A-0046, 2021-Ohio-3076, 177 N.E.3d 1039, ¶ 46.[3] We concur and find no error when a trial court takes "the recommended and commonly practiced precautions to protect all individuals involved, while adhering to the rules and abiding by the rights of [appellant], albeit in a manner different from pre-pandemic procedure." *Id.* In fact, prior to the commencement of trial, the trial court specifically described in the record the jury selection

---

[3] The Ohio Supreme Court's Chief Justice provided numerous guidance bulletins to courts maintaining operations during the pandemic that repeatedly emphasized if a person called for jury duty fails to appear because of the fear of COVID-19, the trial court should treat that as a legitimate excuse. To ease juror concerns between complying with a court order and risking their health or that of their families, trial courts should, among other measures, ensure social distancing and sanitation supplies, summon the smallest number of jurors possible, conduct voir dire in small groups, establish a liberal policy to excuse jurors with health concerns, and grant continuances. *See also State ex rel. McArtor v. Kovack*, 158 Ohio St.3d 1472, 2020-Ohio-1489, 143 N.E.3d 508, ¶ 14 (Kennedy, J. dissent).

16

process, including five coronavirus questions,[4] to which appellant did not object as required by Crim.R. 24(F). *State v. Williams*, 6th Dist. Lucas No. L-95-076, 1996 WL 367364, *3 (May 17, 1996), citing former Crim.R. 24(E), now Crim.R. 24(F).

{¶ 27} Appellant misrepresents the record by alleging the jury selection allowed "at least some self-selection by jurors simply not showing up [on Wednesday]." Again, the fluid jury selection process, to which appellant did not object, was reviewed prior to the commencement of trial on August 3. Because appellant did not object to the jury selection process, he waived all but plain error, and we do not find any plain error in the record. *State v. Davis*, 3d Dist. Seneca No. 13-16-30, 2017-Ohio-2916, ¶ 23; *see State v. Lundgren*, 73 Ohio St.3d 474, 480, 653 N.E.2d 304 (1995); *see also State v. Moore*, 81 Ohio St.3d 22, 26, 689 N.E.2d 1 (1998); *see also Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, at ¶ 120. The trial court specifically reviewed how each juror would be individually questioned for qualifications, and then once the qualified jurors were identified from the morning and afternoon batches, then the voir dire process would proceed until 12 jurors

---

[4] The questions were described by the trial court as "standard": (1) Has the person or any member of the household been diagnosed with COVID-19? (2) Has the person or any member of the household been advised to get tested for COVID-19 and/or to quarantine in the last 14 days? (3) Has the person or any member of the household been in close contact with any person known to have COVID-19 in the last 14 days? (4) Does the person currently have symptoms, including fever or chills, chronic cough, difficulty breathing, unusual fatigue, persistent headache, new loss of taste or smell or persistent sore throat? And (5) will COVID-19 concerns prohibit you from concentrating on the evidence presented at trial and rendering a fair and impartial verdict?

and four alternate jurors were seated for trial. All of this was accomplished by the actual start of testimony on Wednesday morning, August 5.

{¶ 28} However, we recognize that African-Americans are a distinctive group. *State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, 836 N.E.2d 1173, ¶ 66. Nevertheless, similar to *Jackson*, appellant provides no evidence that African-Americans in Lucas County are unfairly represented in venires, or jury pools, relative to their numbers in the community. *Id.* Also similar to *Jackson*, appellant provides no evidence of systematic exclusion of African-Americans in the administration of the Lucas County jury-selection process. *Id.* at ¶ 67. Appellant's mere allegation that African-Americans were not adequately represented on his particular venire and jury fails a *Duren* analysis. *State v. Jones*, 91 Ohio St.3d 335, 340, 744 N.E.2d 1163 (2001); *State v. McNeill*, 83 Ohio St.3d 438, 444, 700 N.E.2d 596 (1998) (underrepresentation on a single venire is not systemic exclusion under *Duren*).

{¶ 29} We reviewed the record and do not find any clear abuse of discretion for the trial court's oversight of the jury selection process and the resulting representative cross-section of the community. Appellant's due process claim fails.

**B. Equal Protection**

{¶ 30} Appellant also argues his equal protection rights were violated when the trial court granted appellee's preemptory dismissal of the only African-American juror, juror No. 30, in violation of *Batson v. Kentucky*, 476 U.S. 79, 90 L.Ed.2d 69, 106 S.Ct. 1712 (1986).

18

**{¶ 31}** The Ohio Supreme Court recognizes that to establish a rebuttable presumption to an equal protection challenge due to the selection and composition of African-Americans to the petit jury, appellant must provide statistical evidence which shows a significant discrepancy between the percentage of African-Americans in Lucas County and the percentage of African-Americans on jury venires. *State v. Jones*, 91 Ohio St.3d 335, 340-41, 744 N.E.2d 1163 (2001). Appellant fails to provide any such evidence, and his equal protection claim fails for that reason alone.

**{¶ 32}** Nevertheless, in a *Batson* challenge, appellant has the initial burden to make a prima facie case of racial discrimination. *State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, ¶ 50. Because the trial court accepted as the first step appellant's mere allegation of racial discrimination, based on juror No. 30's identification as African-American, the burden shifted to appellee to provide race-neutral reason for the peremptory challenge of juror No. 30. *Id.* at ¶ 51.

**{¶ 33}** The proffered reason need not rise to a for-cause challenge, and the reason will be deemed race-neutral unless discriminatory intent is inherent in appellee's explanation. *Id.* Appellee's race-neutral reason is that juror No. 30 would be unable to evaluate the totality of the evidence presented when deciding this case because of his dramatic changes and extreme contradictions in response to questioning. Juror No. 30 expressed a tendency to consider sentencing issues, which they are instructed is solely the judge's responsibility, and mixing them with the facts. Appellee pointed out, "In this case, the State has struck or has stricken with peremptory challenges two jurors who were white

19

who expressed similar sentencing concerns, [juror No. 32] and [juror No. 33]." Appellant did not oppose those peremptory challenges. Appellee further argued juror No. 30 rapidly moved from extreme aversion, including "exhibiting physical signs of great discomfort," to "autopsy photos, things that would involve testimony as to dead bodies, gun violence and blood" to being "moved by the spirit and felt that he would be able to look at those pictures." As appellee explained, "The State's concerned that this urge, this feeling that overcame [juror No. 30] and caused him to sit on this case might similarly overcome him in the jury room and cause him to make his decision based on what he feels the spirit is inspiring him to do as opposed to the evidence in the case."

{¶ 34} The final step is for the trial court to determine whether appellant has proved purposeful discrimination. *Id.* at ¶ 52. The trial court may express its opinion of the race-neutral justification by clearly rejecting the *Batson* challenge without offering detailed findings. *Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, at ¶ 160. The trial court's determination will not be reversed on appeal unless clearly erroneous. *Thompson* at ¶ 53.

{¶ 35} After hearing additional arguments by the parties, the trial court granted the peremptory challenge of juror No. 30 for the following reasons.

> The challenge that [the prosecutor] raises I find is not [a] sham. * * *
> The questions that the State asked were, in fact, meaningful. About the autopsy, I mean that's certainly going to be part of, apparently, what we're going to see today. And he was – his reactions both verbally and non-

20

verbally, his revulsion, his physically saying he was getting sick just thinking about it, all of a sudden changing on a dime is of concern.

He was not questioned or treated disparately. In fact, he was the one, [juror No. 30]; that is, who offered without prompting a lot of the statements that we're talking about today. The State's already exercised its preempts on a couple of the jurors who had sentencing issues. His own statements contradicted his own earlier statements.

The court's mindful of the fact that [juror No. 30] is the only African-American left on the venire. * * * Nonetheless, this is not a challenge for cause. It is a peremptory challenge. And given the standards applied by the court, all the way from [*Batson*] to [*State v. Singer*, 6th Dist. Lucas No. L-17-1309, 2019-Ohio-1922], I find that the challenge is merited, * * * [and juror No. 30's] dismissal peremptorily is granted.

{¶ 36} We reviewed the record and do not find the trial court's grant of appellee's peremptory challenge of juror No. 30 was clearly erroneous. Appellant's due process claim fails.

{¶ 37} Appellant's twelfth assignment of error is not well-taken.

### IV. Sufficiency of Evidence

{¶ 38} Appellant's ninth assignment of error argues appellee failed to meet its burden to produce sufficient evidence to convict him of murder, aggravated robbery, and aggravated burglary, each with firearm specifications. Specifically, appellant argues that

21

circumstantial evidence does not carry the same weight as direct evidence, and, alone, is insufficient to support his guilty verdicts. Appellant concludes the Ohio Supreme Court wrongly decided *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), which "does not ensure meaningful due process." Appellant further argues that "there is something wrong with the system" since *Jenks* and "humbly proposes that the Court consider a return to Ohio's pre-*Jenks* standard of review for circumstantial cases like this one," citing *State v. Kulig*, 37 Ohio St.2d 157, 309 N.E.2d 897 (1974), *overruled by Jenks* at paragraph one of the syllabus.[5] We disagree, as the Ohio Supreme Court has determined no due process violation occurs where, "The legal change from *Kulig* to *Jenks* did not expose [a defendant] to criminal liability for conduct that was legal before the change or increase the potential for the same conduct." (Citations omitted.) *Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, at ¶ 256 (clarifying that *Jenks* represented a procedural change, not a substantive change, to the elements of an offense).

{¶ 39} All evidence admitted against the appellant at trial may be considered on a claim of insufficient evidence. *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126,

---

[5] "Circumstantial evidence and direct evidence inherently possess the same probative value and therefore should be subjected to the same standard of proof. When the state relies on circumstantial evidence to prove an essential element of the offense charged, there is no need for such evidence to be irreconcilable with any reasonable theory of innocence in order to support a conviction. Therefore, where the jury is properly and adequately instructed as to the standards for reasonable doubt a special instruction as to circumstantial evidence is not required. (*Holland v. United States* [1954], 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150, followed; *State v. Kulig* [1974], 37 Ohio St.2d 157, 66 O.O.2d 351, 309 N.E.2d 897, overruled.)"

22

767 N.E.2d 216, ¶ 80. "Appellee could meet its burden at trial using circumstantial evidence." *State v. Duke*, 6th Dist. Wood No. WD-20-001, 2021-Ohio-1552, ¶ 26. "'While inferences cannot be built on inferences, several conclusions can be drawn from the same set of facts; and a series of facts and circumstances can be used as a basis for ultimate findings.'" *Id.*, quoting *State v. Lott*, 51 Ohio St.3d 160, 168, 555 N.E.2d 293 (1990). Relevant circumstantial evidence may be used to infer criminal intent for appellant's offenses, including to infer appellant acted knowingly without intending the specific result. *State v. Chears*, 6th Dist. Wood No. WD-21-026, 2022-Ohio-861, ¶ 18.

{¶ 40} For the following reasons, we further disagree with appellant.

## A. Test for Sufficiency of the Evidence

{¶ 41} The test for sufficiency of the evidence is "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, *superseded by constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89, 102, 684 N.E.2d 668 (1997), fn. 4, and following *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). "'Proof beyond a reasonable doubt' is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of the person's own affairs." R.C. 2901.05(E). A sufficiency-of-the-evidence challenge asks whether the evidence adduced at trial "is legally sufficient to support the jury verdict as a matter

23

of law." *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 219.

{¶ **42**} *Worley*, 164 Ohio St.3d 589, 2021-Ohio-2207, at ¶ 57.

{¶ **43**} "In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). "'But the fact that a question of law involves a consideration of the facts or the evidence does not turn it into a question of fact. Nor does that consideration involve the court in weighing the evidence or passing upon its credibility.'" *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, 983 N.E.2d 1245, ¶ 25, quoting *O'Day v. Webb*, 29 Ohio St.2d 215, 219, 280 N.E.2d 896 (1972).

### B. Murder, Aggravated Robbery, and Aggravated Burglary

{¶ **44**} The record repeatedly refers to appellant's complicity with his co-defendants for the events on July 6, 2019, as appellant participated in the robbery and murder of Mr. Carr along with the robbery and wounding of others present in the apartment. Appellee charged appellant under the statutes of the principal offenses and was not required to explicitly allege complicity. R.C. 2923.03(F); *State v. McFarland*, 162 Ohio St.3d 36, 2020-Ohio-3343, 164 N.E.3d 316, ¶ 28.

{¶ **45**} In order for the jury to find appellant guilty of murder in violation of R.C. 2903.02(B), appellee must prove beyond a reasonable doubt that on or about July 6, 2019, in Lucas County, Ohio, appellant caused the death of Mr. Carr as the proximate result of committing or attempting to commit a violent first-degree offense, in this case aggravated

24

robbery, which must also be proven by appellee. Mr. Carr was shot and killed by Mr. Wright while appellant was present and complicit in that death.

{¶ 46} In order for the jury to find appellant guilty of aggravated robbery in violation of R.C. 2911.01(A)(1), appellee must prove beyond a reasonable doubt that on or about July 6, 2019, in Lucas County, Ohio, appellant in attempting or committing a theft offense, as defined in R.C. 2913.01(K), or in fleeing immediately after the attempt or offense, shall have a deadly weapon on or about him or under the his control and either display the weapon, brandish it, indicate that he possesses it, or use it. The mens rea, or criminal intent, necessary for aggravated robbery is found in the specific, underlying theft offense. *State v. Wesson*, 137 Ohio St.3d 309, 2013-Ohio-4575, 999 N.E.2d 557, ¶ 29 (there is no mens rea element to elevate the theft offense to aggravated robbery because possession or control of a deadly weapon while committing the offense is strict liability). Nor is there a mens rea element for the firearm specification itself, which is penalty enhancement. *State v. Chears*, 6th Dist. Wood No. WD-21-026, 2022-Ohio-861, ¶ 15. Several witnesses testified that appellant brandished his gun to the people in the apartment, while pacing back and forth, ordered them to not move and "run pockets" (hand over wallets, money, drugs, phones, weapons, and anything else), all of which were taken and not returned.

{¶ 47} In order to prove aggravated robbery, appellee must also prove a "theft offense." A "theft offense" includes "theft," defined by R.C. 2913.02(A), as, "No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert

25

control over either the property or services in any of the following ways: (1) Without the consent of the owner or person authorized to give consent; * * * (4) By threat; [or] (5) By intimidation." The property taken from the victims at gunpoint was not returned.

{¶ 48} In order for the jury to find appellant guilty of aggravated burglary in violation of R.C. 2911.11(A)(2), appellee must prove beyond a reasonable doubt that on or about July 6, 2019, in Lucas County, Ohio, appellant by force, stealth, or deception, trespassed in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than his accomplice is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, in this case, theft, which must also be proven by appellee, if he has a deadly weapon or dangerous ordnance on or about his person or under his control. Appellant entered the apartment by stealth with a gun and the intent to steal property from those inside who were not his accomplices.

{¶ 49} In order for the jury to find appellant guilty of the firearm specifications in violation of R.C. 2941.145(A), the indictment must specify, which it did for each underlying offense, that appellant had a firearm on or about his person or under his control while committing the offense and either displaying, brandishing, using to facilitate, or indicating possession of, a firearm.

{¶ 50} For reasons that follow, we find the record contains legally sufficient evidence to sustain the verdicts for the foregoing offenses.

26

## 1. In-Court Identification

{¶ 51} Appellant specifically challenges for his ninth assignment of error the sufficiency of circumstantial evidence identifying him as the offender because "there is an absence of any in-court identification of Mr. Roberts as far as being inside of 1324 Ironwood participating in this crime." However, we find the record contains direct and circumstantial evidence, when viewed in a light most favorable to the prosecution, that a rational trier of fact could have found beyond a reasonable doubt the essential elements of the foregoing crimes, including identifying appellant as the offender.

{¶ 52} First, appellant was identified through photo array testimony by two separate witnesses, Mr. Zeller and Mr. Martin, who independently received separate blind-administered photo arrays within hours of the incident. The Toledo police detectives, who blindly-administered each photo array and who confirmed each time appellant was identified, also testified at trial. All were subject to cross examination.

{¶ 53} Second, appellant was identified in court by witnesses, each of whom were subject to cross-examination. Mr. Martin identified appellant, nicknamed Mickey. Mr. Martin testified that he and the co-defendants picked appellant up from his residence in the early hours of July 6, 2016, and together they drove to 1324 Ironwood. Mr. Martin and appellant stayed in the car and smoked while Mr. Wright and Mr. Eaton entered 1324 Ironwood to purchase marijuana. After that transaction, all four co-defendants drove to another location to purchase different drugs and stopped at a gas station for snacks. While Mr. Wright was in the gas station, Mr. Martin heard appellant and Mr. Eaton discuss why

27

Mr. Wright and Mr. Eaton did not rob the victims at 1324 Ironwood. Mr. Martin saw Mr. Wright enter the car from the gas station with a gun.

{¶ 54} Soon after, they returned to 1324 Ironwood, and Mr. Wright and Mr. Eaton entered the apartment again. Appellant stayed with Mr. Martin in the car until appellant received a text message about the number of people in the apartment and abruptly exited the car. Mr. Martin saw appellant enter 1324 Ironwood as the third intruder with a gun drawn. Within minutes, Mr. Martin heard gunshots, unknown people ran out of the house and up the street on foot, and Mr. Martin started the car. Then the three co-defendants ran out with Mr. Wright helping appellant get into the back of the getaway car, and appellant exclaimed that Mr. Wright shot him in the groin. Mr. Martin drove off quickly to enter the highway, was told by Mr. Wright to slow down to a normal speed, but the car ran out of gas on an exit ramp at the Craig Street Bridge. Appellant separated from the co-defendants while Mr. Wright ordered Mr. Martin to call 9-1-1 and anonymously report that a pedestrian had been randomly shot on the street.

{¶ 55} Mr. Jackson testified he was in the apartment both times Mr. Wright and Mr. Eaton entered. The first time was at around 2:00 a.m. when Mr. Wright and Mr. Eaton purchased drugs and stayed to play video games, smoke and drink; then they left. The second time, Mr. Wright and Mr. Eaton entered the apartment after 3:00 a.m. with guns drawn, facing him, and within minutes of them a third person entered behind him, also announcing the robbery and for nobody to move. Mr. Jackson, glanced back to see the person wearing a hoodie with his face and some dreadlocks revealed, with a gun and

28

ordering the occupants to "run pockets" and hand over wallets, money, drugs, phones, weapons, and anything else. Mr. Jackson also has other opportunities to see appellant as appellant moved about. Mr. Jackson stated that Mr. Wright used his gun first, hitting the wall near where he was sitting, and then a rapid exchange of gunfire ensued by the three co-defendants with guns because at that point Mr. Eaton had taken the victims' guns. Gun shots were aimed at Mr. Jackson as he and another victim, ran outside to safety and down the block. Mr. Jackson was wounded in the hand.

{¶ 56} In addition, Mr. Zeller testified, subject to cross examination, that he was in the apartment both times Mr. Wright and Mr. Eaton entered. The second time, he was seated opposite from Mr. Jackson and faced the kitchen, and was aware of two men behind him with one or more guns, when he saw appellant enter as the third person with a gun drawn. Mr. Zeller described appellant's physical characteristics, including clothing, hair and facial features. Mr. Zellar heard appellant call out, "'Run your pockets, wallets, phones, everything.'" Mr. Eaton took Mr. Zeller's Taurus TH9 gun.

{¶ 57} In addition, Dewey Edwards testified that on July 5, 2019, he lent Mr. Wright, his "god-nephew" and house guest, the car that was eventually used for the getaway. He was later awakened early on July 6 by an urgent call from Mr. Wright demanding Mr. Edwards report the car as stolen, which he did, knowing that it was not stolen, although he did not yet know it was abandoned on the Craig Street Bridge with no gas. He later learned that Mr. Wright had stolen his gun, which Mr. Wright used in the

29

apartment. He also identified appellant in court as the person Mr. Wright introduced to him more than once as "Mickey."

{¶ 58} Sergeant Kennedy identified appellant in court: "Well, I knew that the family of the murder victim was [at St. Vincent's Hospital]. So I went to go speak with them and I knew that there was also another victim of a gunshot wound was also there as well." After Sergeant Kennedy identified appellant in the courtroom, he confirmed, "I can recognize [appellant's] tattoos." In addition, Detective Mooney identified appellant in court and by his nickname, "Mickey."

{¶ 59} Third, appellant was identified at trial by the totality of the evidence when considered together. It is undisputed appellant was found by Officer Eckel with a gunshot wound to his groin near the Craig Street Bridge shortly after the getaway car ran out of gas. A ballistics expert, David Cogan, testified that the bullet retrieved from appellant's groin at St. Vincent's Hospital, matched Mr. Wright's gun used to kill Mr. Carr inside the apartment, and matched the shell casings found inside from gun. Stacy Violi of the state crime lab testified that the DNA blood evidence retrieved from the abandoned getaway car matched appellant's DNA. Officer Eckel's bodycam video when appellant was found near the Craig Street Bridge and needing medical attention for the gunshot wound shows appellant's clothing, hair and facial features matching witness testimony during contemporaneous police interviews conducted far from the Craig Street Bridge area. Sergeant Kennedy, Detective Kozlaker, retired Officer Cavanaugh, Detective Morford, and Richard Leal, the records custodian for Sprint/T-Mobile, collectively testified regarding

30

the data extracted via search warrants from the cell phones of appellant, Mr. Wright, and Mr. Martin, including text messages between Mr. Wright and appellant, demonstrating the development of the plan to rob the occupants of the 1324 Ironwood apartment with guns, and kill two of the six occupants if necessary.

{¶ 60} We find there was legally sufficient evidence in the record for a rational trier of the facts to sustain appellant's guilty verdicts for murder, aggravated robbery, and aggravated burglary and their respective firearm specifications. Although it is undisputed that Mr. Wright used the gun that killed Mr. Carr, there is legally sufficient evidence to identify appellant and to infer appellant's shared criminal intent for the series of criminal acts that ultimately resulted in Mr. Carr's death.

{¶ 61} Appellant's ninth assignment of error is not well-taken.

### 2. Lesser-Included Offenses

{¶ 62} Appellant's seventh assignment of error argues there is insufficient evidence because, "[t]here is an available inference that [appellant] was not armed, and as such an instruction on simple burglary and robbery, rather than the aggravated version ought to have been given. As burglary * * * is not an offense of violence, had the jury elected to convict upon that charge, then there would have been no basis for the felony murder conviction." We disagree.

{¶ 63} The jury instructions appellant now seeks were not previously sought, although appellant belatedly requested consideration of lesser-included offenses at sentencing. Therefore, appellant waived all but plain error, and no plain error is found

31

where we find appellant's failure to object to the jury instructions reflects a strategy to seek a total acquittal rather than to invite conviction of lesser offenses. *State v. Clayton*, 62 Ohio St.2d 45, 46-47, 402 N.E.2d 1189 (1980). "'Appellant cannot now claim the protection of Crim.R. 52(B) to negate the effect of this tactical decision.'" *Id.* at 47, quoting *State v. Wolery*, 46 Ohio St.2d 316, 327, 348 N.E.2d 351 (1976).

{¶ 64} Nor do we find any plain error for the trial court's failure to sua sponte provide jury instructions on alleged lesser-included offenses. A "judge is to give instructions on lesser-included and inferior-degree offenses only when the evidence would allow a jury to reasonably reject the greater offense and find the defendant guilty on the lesser-included or inferior-degree offenses." *State v. Lloyd*, Slip Opinion No. 2022-Ohio-4259, ¶ 26, *affirming State v. Lloyd*, 8th Dist. Cuyahoga No. 109128, 2021-Ohio-1808, ¶ 25 ("a court must find there is sufficient evidence to allow a jury to reasonably reject the greater offense and find the defendant guilty on the lesser-included or inferior offense"). The "available inference that [appellant] was not armed" is the only grasp of the record that appellant offers, but that "available inference," alone, is not the applicable test to compel including lesser-included offense instructions. Rather, the test is if there is sufficient evidence which allows a jury to reasonably reject the greater offenses and only find appellant guilty of the inferior offenses. Consequently, we do not find there is sufficient evidence for the jury to acquit appellant of the aggravated robbery and aggravated burglary offenses and only convict on "simple" burglary and robbery, as appellant claims.

32

**{¶ 65}** Appellant's seventh assignment of error is not well-taken.

## V. Manifest Weight of the Evidence

**{¶ 66}** In support of his tenth assignment of error, appellant argues his convictions should be reversed with a "modern" approach where "in cases of circumstantial evidence, the weight of the evidence should stand against a conviction if the appellate panel agrees that circumstantial evidence as to an element of the crime also presents a You alone will determine what weight, if any, to give this evidence.," citing, again, the now overruled *Kulig* decision by the Ohio Supreme Court. Appellant further argues the circumstantial evidence does not outweigh the absence of testing on blood at the crime scene, allowing the inference that appellant was not at the crime scene.

**{¶ 67}** In addition, through his first, second, third, fourth, fifth, and sixth assignments of error, appellant challenges the credibility of specific evidence either admitted or suppressed by the trial court arguing they lack the weight necessary to support his guilty verdicts.

**{¶ 68}** A challenge, based on the manifest weight of the evidence to a jury, questions its effect in inducing belief of appellant's guilt; it questions whether the jury could find the inclination of a greater amount of credible evidence was admitted at trial to sustain that decision than not. *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541. The unanimous concurrence of all three judges of a court of appeals panel is required to overturn, on the weight of evidence, a judgment that results from a jury. *Id.* at 389.

33

{¶ 69} The admission of evidence, as well as the regulation of the examination of witnesses, rests within the sound discretion of the trial court, and we will not reverse those rulings without a clear demonstration of an abuse of that discretion resulting in material prejudice to a party. *Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, at ¶ 111.

{¶ 70} For the following reasons, we find the greater amount of credible evidence was presented to the jury to induce belief of appellant's guilt, and appellant's tenth assignment of error is not well-taken.

## A. Stare Decisis

{¶ 71} We previously discussed why appellant's reliance on *Kulig* is misplaced under *Jenks* and its progeny for his self-described "modern" standard to diminish the probative value of circumstantial evidence in order to support a conviction unless it is irreconcilable with any reasonable theory of innocence.

{¶ 72} Again, "[c]ircumstantial evidence and direct evidence inherently possess the same probative value and therefore should be subjected to the same standard of proof." *Jenks*, 61 Ohio St.3d at 259, 574 N.E.2d 492, paragraph one of the syllabus. We decline appellant's invitation to violate the doctrine of stare decisis and overturn *Jenks* and its progeny issued by the Ohio Supreme Court, a higher authority to this court. *State v. Szozda*, 6th Dist. Lucas No. L-21-1026, 2022-Ohio-2294, ¶ 36-37.

{¶ 73} Thus, appellant's argument to diminish the probative value of the circumstantial evidence placing him at the crime scene fails. The absence of direct evidence

34

testing blood from the crime scene to his DNA is not fatal to the jury's verdicts in light of the totality of the circumstantial and direct evidence admitted at trial and the jury's exclusive role to determine the weight to give the evidence. As discussed below for his first six assignments of error, appellant identifies various challenges to specific evidence to ultimately argue the jury could not have found enough credible evidence was admitted at trial to sustain that decision than not.

### B. Motion to Suppress Photo Array Evidence

{¶ 74} Appellant's first assignment of error argues the trial court violated his due process rights when it denied his September 10, 2019 motion to suppress Mr. Zeller's identification of appellant from an "overly suggestive and improperly administered" photo array. Appellant further argues four reasons why Mr. Zeller's identification of appellant is not credible: (1) at the subsequent suppression hearing Mr. Zeller testified that he knew and had previously seen appellant, although he did not know appellant's name, and at one point told detectives he never saw appellant before; (2) yet Mr. Zeller failed to mention appellant had tattoos "all over [his] face" while testifying at trial about appellant's dreadlocks hair style, nose, mouth, and tattoos on his arms; (3) the photo array "included only black males with facial tattoos" simply because appellant "was a suspect and had facial tattoos"; and (4) Mr. Zeller had difficulty independently identifying appellant during the photo array and never identified appellant or his facial tattoos at trial.

{¶ 75} Our review of the trial court's denial of appellant's motion to suppress evidence presents a mixed question of fact and of law. *Williams*, 6th Dist. Lucas No. L-21-

1111, 2022-Ohio-2439, at ¶ 30. Regarding the question of fact, "[w]e must accept the trial court's factual findings, if they are supported by competent credible evidence." *Id.* Regarding the question of law, without deference to the trial court, we determine whether the facts satisfy the applicable legal standard. *Id.* The movant has the burden of proof. *Id.* at ¶ 32. Specifically, photo array evidence is suppressed only if the trial court determines, from the totality of the circumstances, the identification procedure is both unduly suggestive and unreliable. *Id.* at ¶ 31-32. For example, in denying a motion to suppress, the trial court may determine the identification is reliable despite its suggestive character. *Id.* at ¶ 32, 35. A photo array of people similar to, and not identical to, appellant in a majority of physical characteristics, such as age, gender, hair, eye color, skin tone, and facial features, is not unduly suggestive. *Id.* at ¶ 33-34, 36.

{¶ 76} The motion to suppress hearing was held on December 30, 2019. The trial court's February 5, 2020 journalized entry denied the motion, describing the photo array as follows, which we accept:

Photo 1 contains a background color different from the other five, with a man with dark skin and receding short hair, a beard and mustache. Photo 2 shows a man with dark skin, hair apparently a bit longer than Photo 1, and some facial hair, but less than Photo 1. Photo 3 shows Defendant with a full head of dreadlocks and some facial hair and the suggestion of a facial tattoo. Photo 4 shows a man with dark skin, a full head of dreadlocks, and the suggestion of facial hair. Photo 5 shows a man with dark skin (lighter in

36

complexion, however, than the other 5 pictures), facial hair, tattoos, and a hairstyle of long and wiry type. Photo 6 shows a man of dark skin, short hair, and some facial hair. All photos are full-color, not black-and-white, and all equally suffer from less than perfect resolution.

{¶ 77} The trial court, citing *State v. Waddy*, 63 Ohio St.3d 424, 439-440, 588 N.E.2d 819 (1992), concluded that appellant's photograph did not stand out, and the photo array was not unreliable under the totality of circumstances, because: (1) Mr. Zeller had opportunity to view the suspect's face behind the drawn gun during the crime, (2) Mr. Zeller centered his attention to the suspect's face due to the drawn gun and to the statements made in furtherance of the crime, (3) the accuracy of the identification, (4) Mr. Zeller's level of certainty, (5) the short amount of time that had passed between the crime and the identification, and (6) the lack of substantial likelihood of misidentification.

{¶ 78} We find competent credible evidence supporting the trial court's factual findings, and, as a matter of law, we do not find appellant met his burden to show the identification procedure was both unduly suggestive and unreliable. We find no due process error and no abuse of discretion from the trial court's denial of appellant's motion to suppress.

{¶ 79} Appellant's first assignment of error is not well-taken.

### C. Recalling Mr. Edwards

{¶ 80} Appellant argues for his second assignment of error that the trial court abused its discretion when it violated Evid.R. 611 and allowed Mr. Edwards, who walks with a

cane, to be recalled to the stand. Appellant argues appellee interfered with Mr. Edwards' testimony to prompt the recall. We disagree.

{¶ 81} "The determination of whether the state may recall its witness for additional testimony is well within the sound discretion of the trial court." *Bowling Green v. Pero*, 6th Dist. Wood No. WD-86-26, 1986 WL 14273, *4 (Dec. 12, 1986).

{¶ 82} Appellant does not identify which part of Evid.R. 611 was violated during appellee's direct examination of Mr. Edwards when asked "to stand and take a look around the courtroom and if you see somebody in the courtroom today who might be the person that you know as Mickey, could you point out where that person is sitting and describe what that person is wearing?" Mr. Edwards responded, "I don't know * * * I can't see nobody at this point," referring to the pandemic-required courtroom arrangement, with plexiglass barriers, between the witness stand and the defense table. This mirrors the issue raised by appellant during trial. For example, during Detective Mooney's testimony, after Mr. Edwards', appellant was concerned that the glare off the plexiglass, and the general courtroom layout, obstructed his and the jury's view of the witness and the physical evidence.

{¶ 83} At the conclusion of appellee's direct examination of Mr. Edwards, appellee waived cross examination of the witness, who the judge then excused and released the jury for a lunch break at 11:53 a.m. Just two minutes later, at 11:55 a.m., appellee moved the trial court to recall Mr. Dewey after the lunch break, explaining:

38

Your Honor, as the prosecutors exited the courtroom, Mr. Dewey Edwards was waiting in the hallway. He indicated to the State that as he left the courtroom, he passed by the defendant, Mr. Roberts, and was able to get a better look at him [than] he had seated at the witness table. And that upon a closer look as he exited the courtroom, he recognized the defendant as the person he knew as Mickey.

{¶ 84} After the lunch break, appellant objected to recalling Mr. Edwards "to give him a second bite at the apple." After hearing additional arguments from the parties, the trial court decided, "I'll allow Mr. Edwards to be recalled subject to, I'm sure, rigorous cross examination from the defense on the nature of his identification of the defendant upon his walking out of the courtroom and walking by defense counsel's table. * * * So this will also give * * * defense the opportunity to pursue that line of questioning [arising from the Mr. Edwards' identification of the appellant]."

{¶ 85} Mr. Edwards was sworn in again and replied, "Yes. * * * That's Mickey, which is known as Dominique Roberts," after appellant stood up without a face mask and appellee asked, "From where you're seated with the ability to see the defendant's unmasked face, do you recognize him?" Appellant then cross examined Mr. Edwards, and the witness responded, "When I walked by [the counsel table when leaving the courtroom], I had a good look at him. I knew it. Coming in I wasn't looking. I was looking at the floor and all the stuff, trying to make sure I did not trip. * * * That's why I did not recognize

39

him." Mr. Edwards further explained he knew appellant's face, braids, tattoos, and eyes: "That's why I asked to speak to [the prosecutor] outside when I went to leave."

{¶ 86} We find no abuse of discretion by the trial court when it allowed appellee to recall Mr. Edwards, subject to cross examination, for an in-court identification of appellant.

{¶ 87} Appellant's second assignment of error is not well-taken.

### D. Refusing DNA Swab

{¶ 88} Appellant's third assignment of error challenges the trial court's admission of DNA evidence over his Evid.R. 403 objection. Appellant also challenges the trial court's inclusion of a jury instruction on awareness of guilt for testimony of appellant's repeated refusal to deny a search warrant to provide a DNA buccal swab.

{¶ 89} Detective Kozlaker, the lead investigator, testified at trial that a search warrant for appellant's buccal swab DNA was necessary to test against the blood found in the abandoned getaway car. This was significant to the investigation because appellant insisted to the police that he was merely a pedestrian at 3:00 a.m. in a residential area near the Craig Street Bridge when he was robbed and shot by a passing car. Sergeant Kennedy testified this story was unusual because it was not corroborated by any phone calls of shots fired by the area residents. Detective Kozlaker provided appellant with a copy of the search warrant, but appellant refused three times to open his mouth and cooperate. On the third attempt, appellant "had to be held down by several deputies, and the nurse at the Lucas County Jail had to extract the swab from his mouth."

40

**{¶ 90}** Appellant fails to argue on appeal how, other than the mere fact of mentioning Evid.R. 403, the DNA evidence itself lacked probative value in light of any the danger of unfair prejudice, confusion of the issues, or of misleading the jury. *Schwochow v. Chung*, 102 Ohio App.3d 348, 353, 657 N.E.2d 312, 316 (6th Dist.1995); *State v. Cepec*, 149 Ohio St.3d 438, 2016-Ohio-8076, 75 N.E.3d 1185, ¶ 116 (no error for failure to describe how the probative value of the conduct was outweighed by the danger of unfair prejudice).

**{¶ 91}** Rather, appellant's argument focuses on the jury instruction itself, modeled on Ohio Jury Instruction 409.13:[6]

> Testimony has been admitted indicating that the defendant refused to provide a DNA sample as required by a search warrant. You are instructed that refusal to provide a DNA sample as required by a search warrant alone does not raise a presumption of guilty, but it may tend to indicate the

---

[6] Testimony has been admitted indicating that the defendant (fled the [scene] [*describe jurisdiction*]) (escaped from custody) (resisted arrest) (falsified his/her identity) (changed appearance) (intimidated a witness) (attempted to conceal a crime) (*describe other conduct*). You are instructed that (*describe defendant's conduct*) alone does not raise a presumption of guilt, but it may tend to indicate the defendant's (consciousness) (awareness) of guilt. If you find that the facts do not support that the defendant (*describe defendant's conduct*), or if you find that some other motive prompted the defendant's conduct, or if you are unable to decide what the defendant's motivation was, then you should not consider this evidence for any purpose. However, if you find that the facts support that the defendant engaged in such conduct and if you decide that the defendant was motivated by (a consciousness) (an awareness) of guilt, you may, but are not required to, consider that evidence in deciding whether the defendant is guilty of the crime(s) charged. You alone will determine what weight, if any, to give to this evidence. (Emphasis sic.)

41

defendant's awareness of guilt. If you find that the facts do not support that the defendant refused to provide a DNA sample as required by a search warrant or if you find that some other motive prompted the defendant's conduct or if you are unable to decide what the defendant's motivation was, then you should not consider this evidence for any purpose. However, if you find that the facts support that the defendant engaged in such conduct and if you decide that the defendant was motivated by an awareness of guilt, you may, but are not required to, consider that evidence in deciding whether the defendant is guilty of the crimes charged. You alone will determine what weight, if any, to give this evidence.

{¶ 92} In making its determination, the trial court heard the parties' arguments and found the Tenth District Court of Appeals directly addressed this issue.

Testimony that appellant refused to provide a DNA sample was admissible as evidence of consciousness of guilt. The refusal suggests that appellant was attempting to conceal his involvement in the crime. The testimony describing the steps taken by the police to obtain the sample from appellant was relevant to show just how far appellant would go to conceal his involvement. (Citations omitted.)

*State v. Wade*, 10th Dist. Franklin No. 06AP-644, 2008-Ohio-1797, ¶ 17; *Williams*, 79 Ohio St.3d at 11, 679 N.E.2d 646 (evidence of conduct showing consciousness of guilt, and, thus, of guilt itself, is universally conceded as admissible). We agree.

42

**{¶ 93}** "After arguments are completed, a trial court must fully and completely give the jury all instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact finder. (Crim.R. 30[A], construed.)" *State v. Comen*, 50 Ohio St.3d 206, 553 N.E.2d 640 (1990), paragraph two of the syllabus. The decision whether to give a requested jury instruction is within the sound discretion of the trial court. *Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, at ¶ 240, citing *State v. Wolons*, 44 Ohio St.3d 64, 68, 541 N.E.2d 443 (1989). A jury instruction on awareness of guilt that "was neither arbitrary nor unreasonable, and did not create an improper mandatory presumption" is appropriate. *State v. Taylor*, 78 Ohio St.3d 15, 27, 676 N.E.2d 82 (1997).

**{¶ 94}** Appellant is mistaken that the only appropriate interpretation of the awareness of guilt instruction is for fleeing from a crime scene. "[B]ehaviors indicating a defendant's consciousness of guilt are among the surrounding facts or circumstances that the trier of fact can use to infer the defendant's purpose." *State v. Wrasman*, 3d Dist. Auglaize No. 2-20-03, 2020-Ohio-6887, ¶ 27. In fact, all "other conduct following the completion of a crime may be relevant evidence of consciousness of guilt." *State v. Johnson*, 144 Ohio St.3d 518, 2015-Ohio-4903, 45 N.E.3d 208, ¶ 72.

**{¶ 95}** We find the instruction given neither required the jury to make an inference of guilt from appellant's DNA refusal, nor required the jury to give any weight to appellant's refusal. In addition, there is no error for a jury instruction on the use of inferences in considering circumstantial evidence. *See State v. Were*, 118 Ohio St.3d 448,

43

2008-Ohio-2762, 890 N.E.2d 263, ¶ 162. Appellant did not object to the general jury instruction on inferences:

> To infer, or to make an inference, is to reach a reasonable conclusion of fact that you may, but are not required to, make from other facts that you find have been established by direct evidence. You may reach a reasonable conclusion about a fact or facts only from other facts or circumstances that have been proved by the greater weight of the evidence. Whether an inference is made rests entirely with you.

**{¶ 96}** We do not find any abuse of discretion by the trial court for the jury instruction on appellant's awareness of guilt.

**{¶ 97}** Appellant's third assignment of error is not well-taken.

### E. Impeaching Mr. Martin

**{¶ 98}** Appellant's fourth assignment of error challenges the trial court's reliance on Evid.R. 404(B) to grant appellee's objection to appellant's cross-examination of Mr. Martin that prevented "fully impeaching" him. Appellant "sought to delve more deeply into an alleged co-conspirator's prior convictions in order to both discredit him and demonstrate that the co-conspirator was familiar with the system, and how to manipulate it to his benefit * * *." Appellant, citing *State v. Sepeda*, 6th Dist. No. L-19-1125, 2020-Ohio-4167, 157 N.E.3d 889, ¶ 22, argues "[Evid.R.] 404(B) simply does not apply to impeachment, or put another way, it is acceptable to infer a propensity for lying from prior lies * * * in the required analysis for 'reverse 404(B).'" Appellant further argues Evid.R.

44

608(B) permits the foregoing line of questions on cross examination to inquire about Mr. Martin's character for truthfulness or untruthfulness. We disagree.

{¶ 99} Evid.R. 404(B)(1) states, "Evidence of any other crime, wrong or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." As explained by the Ohio Supreme Court, "Evidence of other acts may not be used to prove by inference that the accused acted in conformity with those other acts or that he has a propensity to act in that way." *Worley*, 164 Ohio St.3d 589, 2021-Ohio-2207, at ¶ 118.

> The admissibility of other-acts evidence under Evid.R. 404(B) is a question of law that we review de novo. But the trial court's weighing of the probative value of admissible evidence against the danger of unfair prejudice to the defendant pursuant to Evid.R. 403(A) involves an exercise of judgment and will be reviewed for an abuse of discretion. (Citation omitted.)

*Id.* at ¶ 117.

{¶ 100} Mr. Martin was subject to appellant's cross examination. However, "fully impeaching" a witness is not defined in the rules of evidence. It is undisputed Mr. Martin was identified to the jury as appellant's accomplice who was testifying in exchange for a plea deal. Pursuant to R.C. 2923.03(D),[7] the jury was instructed to weigh with great caution

---

[7] "'The testimony of an accomplice does not become inadmissible because of his complicity, moral turpitude, or self-interest, but the admitted or claimed complicity of a witness may affect his credibility and make his testimony subject to grave suspicion, and require that it be weighed with great caution. It is for you, as jurors, in the light of all the

45

the testimony of appellant's accomplices. The trial court granted appellee's objection because appellant could not articulate the purpose of the line of impeachment questions for Mr. Martin other than by "suggesting that the witness has done it before and therefore he must be doing the same thing now [which] is explicitly forbidden by 404(B)." As proffered by appellant, "The comparison is that when [Mr. Martin] is trying to avoid the consequences of what happens when he's with the police, that he does what he does to avoid that. He did it by driving away [in 2015] and now he is doing it by talking." The trial court stated, "I think that's getting too close to the 404(B) line, especially given recent [decision] from the Sixth District taking a very hard line or strict line [on] 404(B) evidence. I'll sustain the objection."

{¶ 101} Appellant's reliance on *Sepeda* is misplaced, as the "'reverse 404(B)' evidence" doctrine discussed in that case applies to a defendant seeking "to introduce other acts evidence of a third party in order to exonerate himself." *State v. Sepeda*, 6th Dist. No. L-19-1125, 2020-Ohio-4167, 157 N.E.3d 889, ¶ 22. Here, appellant is not seeking to exonerate himself through "reverse 404(B)" evidence, but instead seeks to discredit Mr. Martin.

{¶ 102} We do not find the trial court abused its discretion when it sustained appellee's objection to a portion of appellant's cross-examination of Mr. Martin pursuant

---

facts presented to you from the witness stand, to evaluate such testimony and to determine its quality and worth or its lack of quality and worth.'" R.C. 2923.03(D).

46

to Evid.R. 404(B).[8] Additionally, appellant failed to argue the application of Evid.R. 403(A) and 608(B) to the trial court, and has forfeited all but plain error, which we do not find. *Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, at ¶ 115.

{¶ 103} Appellant's fourth assignment of error is not well-taken.

## F. Mr. Martin's Admitted Statements

{¶ 104} Appellant's fifth and sixth assignments of error challenge alleged hearsay statements by Mr. Martin at trial.

{¶ 105} We review de novo a trial court's admission of a hearsay statement. *State v. Richcreek*, 196 Ohio App.3d 505, 2011-Ohio-4686, 964 N.E.2d 442, ¶ 31-32 (6th Dist.). ("On appeal, challenged hearsay is subject to de novo review under the applicable hearsay rule, rather than the more deferential review employed for discretionary rulings."). Evid.R. 801(C) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." "Hearsay is inadmissible under Evid.R. 802, unless a particular statement fails to meet the two-part definition in Evid.R. 801(C), or fully satisfies the conditions for nonhearsay prior statements under Evid.R. 801(D)(1) or (2), or falls within one of recognized exceptions under Evid.R. 803 or 804." *Richcreek* at ¶ 22.

---

[8] We decline appellee's invitation to "clarify *Sepeda's* holding to account for the Supreme Court of Ohio's explicit statement that Evid.R. 404(B) applies to all witnesses" and not just to persons accused of crimes, citing *State v. Mason*, 82 Ohio St.3d 144, 160, 694 N.E.2d 932 (1998), as that issue is not in the record before us. App.R. 9(A)(1).

47

{¶ 106} Appellant, citing *Richcreek* at ¶ 59, argues for his fifth assignment of error the trial erred when it admitted four statements as nonhearsay by Mr. Martin pursuant to Evid.R. 801(D)(1)(b).[9] The trial court summarized them as follows: "The four issues from the July 6, 2019 interview with Detectives Kozlaker and Mooney will be allowed, specifically the identification of Mickey [appellant], ATL [Mr. Eaton] dropping something, Mickey receiving a text about six people being in the apartment and the photo array with the comment about where Mickey was shot under 801(D)(1)(b)." Appellant argues Evid.R. 801(D)(1)(b) does not apply because Mr. Martin's motive to fabricate his story commenced upon his videotaped police interview on July 6, 2019, and was not delayed until December 20, 2019, when a formal plea offer and negotiation began.

{¶ 107} Appellant then argues for his sixth assignment of error the trial court erred when it admitted a hearsay statement by Mr. Martin that Mr. Wright told Mr. Edwards to report as stolen the getaway car. Citing *State v. Robb*, 88 Ohio St.3d 59, 69-70, 723 N.E.2d 1019 (2000), appellant further argues Mr. Martin's hearsay "really does not make a case for conspiracy, at least not involving Roberts." Appellant concludes, "While this issue may not present extreme prejudice in and of itself, it is important to be considered in the context of cumulative error."

---

[9] "A statement is not hearsay if: (1) Prior Statement by Witness. The declarant testifies at trial or hearing and is subject to examination concerning the statement, and the statement is * * * (b) consistent with declarant's testimony and is offered to rebut an express or implied charge against declarant of recent fabrication or improper influence or motive, or (c) one of identification of a person soon after perceiving the person, if the circumstances demonstrate the reliability of the prior identification." Evid.R. 801(D)(1)(b).

48

**{¶ 108}** We are not persuaded by appellant's arguments. As this court has explained, "only prior consistent statements made *before* the alleged motive to fabricate arose are admissible. The issue is not when the charge was made, but when the improper motive arose." (Emphasis sic.) *Richcreek* at ¶ 59, citing *Motorists Mut. Ins. Co. v. Vance*, 21 Ohio App.3d 205, 207, 486 N.E.2d 1206 (10th Dist.1985) ("What the rule permits is the rehabilitation of a witness whose credibility has been attacked by means of a charge that he recently fabricated his story or falsified his testimony in response to improper motivation or influence, by admitting into evidence a consistent statement made by the witness prior to the time of the suggested invention or of the emergence of the motive or influence to invent or falsify, as tending to rebut the charge.").

**{¶ 109}** First, Mr. Edwards independently testified at trial that he reported the car stolen at Mr. Wright's request, who called him directly, so Mr. Martin's testimony overhearing that precise discussion is harmless error at most. Crim.R. 52(A); *Richcreek* at ¶ 43 (even if improper hearsay, the other admissible evidence for the same issue renders harmless any improper hearsay). The same harmless error applies to the four issues admitted by the trial court in light of other admitted testimony and physical evidence.

**{¶ 110}** Mr. Edwards, Mr. Zeller, Mr. Jackson and law enforcement witnesses testified that appellant's street name was Mickey.

**{¶ 111}** Officer Mohler testified finding and retrieving Mr. Zeller's Taurus TH9 gun in the location where Mr. Eaton dropped an object. Detective Eycke testified testing the gun Officer Mohler found.

49

**{¶ 112}** Detectives Morford, Detective Kozlaker, and Mr. Leal collectively testified about extracting cell phone data from appellant's and Mr. Wright's cell phones, including the texts exchanged about six people in the apartment. Mr. Jackson and Mr. Zeller testified describing the scene and how six people were in and about the apartment at the time appellant entered through the kitchen in the rear, gun drawn, telling all the victims not to move and to "run pockets."

**{¶ 113}** Officer Eckel testified arriving near the Craig Street Bridge and finding appellant bleeding from the groin area and taken to St. Vincent's Hospital. Sergeant Kennedy testified interviewing appellant at St. Vincent's Hospital. Officer Sterling testified picking up from St Vincent's Hospital the bullet retrieved from appellant's body. David Cogan testified about forensics lab test results matching Mr. Wright's gun and the bullet retrieved from appellant's body.

**{¶ 114}** Second, appellant's focus on appellee's failure to establish a prima facie case of conspiracy involving Mr. Martin is misplaced, given the totality of the evidence. "There is no requirement that each participant to a conspiracy communicate directly with each other or even know that additional participants would be recruited to commit the crime." *State v. Swain*, 6th Dist. Erie No. E-12-079, 2014-Ohio-1308, ¶ 34. "Statements made to conceal the crime and to avoid arrest, apprehension, and implication may also be in furtherance of the conspiracy." *Id.* at ¶ 35.

**{¶ 115}** Third, Mr. Martin's transaction with the police to exchange his testimony for a plea deal did not arise until six months later, on December 20, at which time the

50

alleged motive to fabricate would be reasonably expected. Appellant concedes that in the video evidence of Mr. Martin's July 6, 2019 police interview "we did hear Detective Kozlaker indicate to Mr. Martin that he's not in trouble at that time," although he insists any detained person would feel compelled to fabricate his story "from the get-go." Appellee responded that "extolling the defendant to tell the truth is distinguishable from a plea offer and plea negotiation in exchange for turning State's witness." The police told Mr. Martin they wanted his story while it was fresh, and Mr. Martin voluntarily spoke with them at a time when neither a plea, nor charges, were contemplated. Mr. Martin signed a Miranda waiver understanding the statements he would give could be used against him. As explained by appellee, and adopted by trial court, "If he believes he's not in trouble, then he would have no reason, no improper motive to fabricate, to get out of the trouble he's not even in."

{¶ 116} The trial court further explained the basis for its decision following its review of a portion of the six-hour police interview of Mr. Martin on July 6, 2019:

> What I was looking at were the July statements that were made before the motive to avoid charges arose. Again, Mr. Martin was told on the video I just watched or the portion of the video I just watched that he was not in trouble, that he was brought down there on an aggravated menacing warrant, apparently. And he was then asked questions about something that happened earlier that night. He begins telling his story, which was not apparently true. That will be for the jury to decide.

51

{¶ 117} Upon de novo review, we find no trial court error admitting statements as either hearsay or nonhearsay. Appellant's fifth and sixth assignments of error are not well-taken.

## VI. Felony Sentencing

{¶ 118} Appellant's thirteenth and fourteenth assignments of error challenge the sentences he received for his three felony offenses with firearm specifications. We review a challenge to felony sentencing pursuant to R.C. 2953.08(G)(2), which states:

> The appellate court's standard for review is not whether the sentencing court abused its discretion. The appellate court may take any action authorized by this division if it clearly and convincingly finds either of the following:
>
> (a) That the record does not support the sentencing court's findings under [R.C. 2929.13(B) or (D)], [R.C. 2929.14(B)(2)(e) or (C)(4)[10]], or [R.C. 2929.20(I)], whichever, if any, is relevant;

_____

[10] "(4) If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following: (a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to [R.C. 2929.16, 2929.17, or 2929.18], or was under post-release control for a prior offense. (b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the

52

(b) That the sentence is otherwise contrary to law.

### A. Consecutive Sentences

{¶ 119} Appellant, citing *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 13, argues for his fourteenth assignment of error the trial court erred when it failed to merge his three felony offenses and firearm specifications for an aggregate total of life with parole after 21 years served. Appellant concedes that while two of the three firearm specifications do not merge pursuant to R.C. 2929.14(B)(1)(g)[11], the trial court should exercise its discretion to merge the third firearm specification with the others. Appellant further argues that the three felonies should merge as offenses of similar import occurring from the same conduct, animus, and harm, which is "to enter the Ironwood apartment, armed with a firearm, to steal from the occupants." We disagree.

{¶ 120} First, the parties submitted sentencing memoranda, and the trial court heard additional arguments before denying appellant's merger requests at the September 4, 2020 sentencing hearing:

seriousness of the offender's conduct. (c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender." R.C. 2929.14(C)(4).

[11] "If an offender is convicted of * * * two or more felonies, if one or more of those felonies are * * * murder, * * * [or] aggravated robbery, * * *, and if the offender is convicted of * * * to a specification of the type described under [R.C. 2929.14(B)(1)(a)] in connection with two or more of the felonies, the sentencing court shall impose on the offender the prison term specified under [R.C. 2929.14(B)(1)(a)] for each of the two most serious specifications of which the offender is convicted * * * and, in its discretion, also may impose on the offender the prison term specified under that division for any or all of the remaining specifications." R.C. 2929.14(B)(1)(g)

53

The Aggravated Burglary involved multiple victims. Mr. Jackson and Mr. Zeller each had property stolen from them at gunpoint. Tyler Carr was shot and killed by Justin Wright while defendant was complicit in that death. Thus, the Aggravated Robbery and the Murder do not merge. The Aggravated Burglary was complete once entry was made into the apartment with a gun and the intent to commit a crime. The evidence at trial demonstrated that the defendant was armed and intended to enter the apartment in order to take part in stealing the property from those who were inside the apartment. That completed the offense of Aggravated Burglary.

The Aggravated Robbery was then attempted and completed by defendant's participation in the running of the pockets of the individuals, the pacing back and forth while brandishing his gun and running pockets and the stealing of the property. These offenses do not merge. The Aggravated Burglary and Murder also do not merge under the same reasoning and involve several distinct victims. * * * There is no reason for Tyler Carr to be shot after the pockets were run and the Aggravated Robbery was complete. There is no reason for defendant to shoot from the kitchen after the Aggravated Robbery was complete as well.

None of the offenses thus merge, and as to the firearm specifications, the court must impose at least two of the three specifications found by the

jury. The court has discretion to impose the third specification pursuant to 2929.14(B) of the Revised Code.

{¶ 121} We agree with the trial court's merger analysis. Merger is a sentencing question, and the defendant bears the burden to establish that R.C. 2941.25 prohibits multiple punishments for a "single" criminal act in light of multiple victims. *State v. Washington*, 137 Ohio St.3d 427, 2013-Ohio-4982, 999 N.E.2d 661, ¶ 18. We review a trial court's R.C. 2941.25 determination de novo as a question of law. *Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, 983 N.E.2d 1245, at ¶ 1, 12, and 25 (a question of law that involves a consideration of the facts does not turn it into a question of fact).

{¶ 122} The trial court was required to only find one of the following three-part test to deny merger under R.C. 2941.25(B): "(1) the conduct constitutes offenses of dissimilar import, (2) the conduct shows that the offenses were committed separately, or (3) the conduct shows that the offenses were committed with separate animus." *Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, at paragraph three of the syllabus. The trial court articulated all three. The distinct harms of robbery and death to Mr. Carr further support rejecting merger. "'[A] defendant's conduct that constitutes two or more offenses against a single victim can support multiple convictions if the harm that results from each offense is separate and identifiable from the harm of the other offense.'" *State v. Jackson*, 149 Ohio St.3d 55, 2016-Ohio-5488, 73 N.E.3d 414, ¶ 128, quoting *Ruff* at ¶ 26.

{¶ 123} In addition, firearm specifications are sentence enhancements, not separate criminal offenses, and do not merge with the underlying felony. *State v. Ford*, 128 Ohio

St.3d 398, 2011-Ohio-765, 945 N.E.2d 498, ¶ 19. We find that R.C. 2929.14(B)(1)(g) applies in this matter and mandated sentencing enhancements for the murder and aggravated robbery firearm specifications along with the trial court's discretion to impose a prison term for the remaining specification for aggravated burglary.

{¶ 124} Second, at sentencing the trial court engaged in the required R.C. 2929.14(C)(4) analysis, both at the sentencing hearing and in the September 8, 2020 journalized sentencing entry, to "find that consecutive sentences are necessary to protect the public from future crime or to punish the defendant and not disproportionate to the seriousness of your conduct and the danger you pose. And the court further finds that both the harm caused was great or unusual such that no single prison term is adequate and that your criminal history requires consecutive sentences." The trial court continued:

> [T]his crime scene was pre-planned and orchestrated to rob Mr. Carr and Mr. Zeller. Upon the defendants' return * * * to the home, they found additional persons present and rather than call off their plan they went forward full steam ahead. The killing of Mr. Carr appears to have been either gratuitous or part of that plan. You and your cohorts didn't just rob people. You shot at them and you killed one. The loss of life and the trauma inflicted on the victims was great and your criminal history as noted before here is chock full of violence, danger and disregard for law and order. At age 29, you now have sixteen lifetime felonies on your record. Our community needs to be protected from you for a long time.

56

**{¶ 125}** Upon de novo review, we find the record of the sentencing hearing transcript and the subsequent judgment entry supports the trial court's findings under R.C. 2941.25 to deny merger of the three felonies, under R.C. 2929.14(B)(1)(g) to deny merger of the third firearm specification, and under R.C. 2929.14(C)(4)(c) to determine consecutive sentences.

**{¶ 126}** Appellant's fourteenth assignment of error is not well-taken.

### B. Reagan Tokes Law

**{¶ 127}** Appellant's thirteenth assignment of error challenges the constitutionality of R.C. 2967.271, a part of the Reagan Tokes Law. Appellant argues the statutory scheme violates the separation of powers established in the Ohio Constitution because it "permits the executive branch to impose additional punishment upon him." We disagree. The "Reagan Tokes Law does not violate the separation-of-powers doctrine." *State v. Eaton*, 2022-Ohio-2432, 192 N.E.3d 1236, ¶ 60 (6th Dist.).

**{¶ 128}** Appellant also vaguely "suggests that ineffective assistance of counsel would apply to the failure to object" on the foregoing grounds. Assuming appellant properly argued ineffective assistance of counsel before us, which he has not, we do not find appellant's defense counsel was ineffective for failing to raise a futile objection. *Lott*, 51 Ohio St.3d at 175, 555 N.E.2d 293.

**{¶ 129}** Appellant then argues that a nunc pro tunc entry is necessary to correct the trial court's error when it "improperly imposed the indefinite sentences to the consecutive sentence." Appellant concedes his sentence calculation was accurately calculated by the

"Bureau of Sentence Computation," but that specific calculation is not in the record before us. App.R. 9(A). Therefore, we first look to the transcript of the September 4, 2020 sentencing hearing:

> COURT: The court finds that you were found guilty by a jury on August 13th, 2020 of Murder, count two, in violation of Revised Code 2903.02(B) and 2929.02. And you are therefore sentenced to an indefinite term of fifteen years to life. In addition, you are sentenced to the accompanying firearm specification, to a term of three years, which is both mandatory and consecutive to the sentence imposed on the underlying murder charge.
>
> You are also found guilty by that jury of Aggravated Robbery, count three, in violation of Revised Code 2911.01(A)(1) & (C), a felony of the first degree. And you are sentenced to a minimum term of eight years and a maximum indefinite term of twelve years on that charge. In addition, you are sentenced to the accompanying firearm specification to a term of three years, which is both mandatory and consecutive to the sentence imposed on the underlying Aggravated Robbery charge.
>
> Finally, you were found guilty by the jury of Aggravated Burglary, count four, in violation of Revised Code 2911.11(A)(2) & (B), a felony of the first degree and you are sentenced to a minimum term of eight years and a maximum indefinite term of twelve years. In addition, you are sentenced to

58

the accompanying firearm specification to a term of three years, which is both mandatory and consecutive to the sentence imposed on the underlying Aggravated Burglary charge.

* * *

The sentences are thus as follows: fifteen years to life consecutive to an aggregate minimum term of sixteen years and a maximum term of twenty years in prison; and additional aggregate mandatory term of nine years, three for each gun specification, is imposed and ordered to be served prior to and consecutive to the sentences for the underlying felonies.

* * *

PROSECUTOR: Your Honor, in the court's additional sentencing description, the court articulated eight to twelve years on each of the Aggravated Robbery and the Aggravated Burglary. However, later in its sentencing colloquy, indicated [a] time period of sixteen to twenty, which would indicate only a single indefinite term of four years. I believe the latter articulation was correct, that one of those two felonies of the first degree would have the indefinite term and the State would ask that be reflected as to the Aggravated Burglary, eight to twelve years.

COURT: So noted and the record will so reflect.

Next we look to the trial court's sentencing entry journalized on September 8, 2020, which states the following:

It is ORDERED that defendant serve 15 years to Life as to [murder], the stated minimum prison term of 8 years as to [aggravated robbery] and a maximum indefinite prison term of 12 years, and the stated minimum prison term of 8 years as to [aggravated burglary] and a maximum indefinite prison term of 12 years. * * * An additional term is imposed as a mandatory and consecutive term pursuant to R.C. 2929.14(C)(1)(a) of 3 years as to [murder], 3 years as to [aggravated robbery], and 3 years as to [aggravated burglary]. This aggregate nine year sentence is ordered to be served prior to the sentences imposed on the underlying felonies.

{¶ 130} We find the trial court's journalized sentencing entry is incomplete and did not include the required aggregate minimum and maximum sentencing range for his consecutive sentences as required by R.C. 2929.144. While we find no merit to appellant's other arguments in this assignment of error, we find limited merit to remand to the trial court for the limited purpose of a nunc pro tunc entry calculating and imposing the mandated R.C. 2929.144 aggregate sentence range that had already been reviewed at the sentencing hearing. *Wright*, 6th Dist. Lucas No. L-20-1206, 2022-Ohio-1537, at ¶ 132-134.

{¶ 131} Appellant's thirteenth assignment of error is well-taken, in part.

### VII. Cumulative Error

{¶ 132} Appellant argues for his eighth assignment of error that he was deprived due process for a fair trial because, when the entire trial is viewed as a whole, he was prejudiced, citing *State v. Madrigal*, 87 Ohio St.3d 378, 397, 721 N.E.2d 52 (2000). We

disagree. In order to begin considering this issue, we must first have found that multiple, non-harmless errors occurred in this case. *Id.* at 398. We have not found any such errors.

{¶ 133} Appellant's eighth assignment of error is well-taken, in part, and not well-taken, in part.

## VIII. Conclusion

{¶ 134} On consideration whereof, the judgment of the Lucas County Court of Common Pleas is affirmed, in part, and reversed, in part. This matter is remanded to the trial court for the limited purpose of a nunc pro tunc entry calculating and imposing the R.C. 2929.144 mandated aggregate sentence range. Appellant and appellee are ordered to equally pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed in part,
reversed in part
and remanded.

State of Ohio v.
Dominique Roberts
C.A. No. L-20-1171

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.            _____
                                                              JUDGE
Thomas J. Osowik, J.            

                                                     _____

61

Christine E. Mayle, J.                                    JUDGE
CONCUR.

_____
JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.